UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

M.O.C.H.A. SOCIETY, INC., et al.,

                                                 Plaintiffs,

                     -vs-                                                                       98-CV-99C

CITY OF BUFFALO, et al.,

                                                 Defendants.

_____

      In Second Amended Complaint "B" in this case (Item 54), plaintiffs claim that the City of Buffalo's policies and procedures for promoting Buffalo firefighters to the rank of lieutenant, including the use of a statewide promotional examination administered in March 1998 (the "1998 Lieutenant's Exam"), resulted in unlawful disparate impact and intentional discrimination against African-American firefighters in violation of 42 U.S.C. §§ 1981, 1983 and 2000e-2 ("Title VII"), and the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296. On March 9, 2009, following a five-day evidentiary hearing, this court ruled that the 1998 Lieutenant's Exam was "job-related for the position and consistent with business necessity," as required under Title VII to validate the use of the Exam notwithstanding its disparate impact. *M.O.C.H.A. Society, Inc. v. City of Buffalo*, 2009 WL 604898, at *18 (W.D.N.Y. March 9, 2009). As a result, the court dismissed plaintiffs' complaint to the extent it sought relief under Title VII based upon disparate impact, leaving the claims of intentional discrimination to be adjudicated.

The City now moves for summary judgment dismissing these remaining claims. For the reasons that follow, this motion is granted, and Second Amended Complaint "B" is dismissed in its entirety.

## BACKGROUND

The procedural and factual background of this twelve-year-old action has been set forth at length in the court's prior rulings, and will not be restated at this juncture. With regard to the remaining claims in Second Amended Complaint "B," plaintiffs allege that the City's use of a racially biased examination to establish its fire lieutenant promotion list constitutes a pattern or practice of intentional discrimination against African-American firefighters, as supplemented by the following discrete acts of discriminatory treatment:

    1. Manipulating the promotion point system to the advantage of White firefighters by automatically listing White rookies ahead of African-American rookies, and by allowing the lieutenants' exam applications of White firefighters to be submitted before the applications of African-Americans (*id.* at ¶¶ 29-32);

    2. Sponsoring examination preparation sessions that are restricted to White firefighters (*id.* at ¶ 33(a));

    3. Making actual test questions or subjects available to White firefighters in advance of the examination that were not made available to African-Americans (*id.* at ¶ 34); and

    4. Manipulating the eligible list for promotion to lieutenant in favor of White applicants by keeping retirement-eligible firefighters on active duty, awarding seniority to White provisional employees, and refusing outright to promote eligible African-American applicants (*id.* at ¶¶ 35-39).

In June 2007, after taking the depositions of named plaintiffs Willie Broadus, Robert Grice, Walter Jones, Victor Muhammad, William Raspberry, and John Tucker, the City moved for partial summary judgment dismissing the intentional discrimination claims on the ground that the deposition testimony provided no concrete evidence to support these

allegations. Plaintiffs responded by filing a cross-motion for partial summary judgment on their disparate impact claim.

This court denied both motions in a decision and order dated November 9, 2007. *M.O.C.H.A. Society, Inc. v. City of Buffalo*, 2007 WL 3354211 (W.D.N.Y. November 9, 2007) (Item 291). The court found genuine issues of material fact precluding summary judgment with respect to plaintiffs' claim that the City engaged in a pattern or practice of intentional discrimination by utilizing the 1998 Lieutenant's Exam as the basis for promotions, notwithstanding its knowledge of the Exam's discriminatory impact or its failure to take any steps to determine whether the Exam was job-related and consistent with business necessity. *Id.*, 2007 WL 3354211 at *5. The court also determined that, while the depositions of the named plaintiffs may indeed have failed to turn up sufficient proof of any of the discrete acts of intentional discrimination alleged in the complaint, plaintiffs were not precluded at the summary judgment stage from relying on the testimony of these individuals as circumstantial proof, along with the available statistical and expert evidence, in support of their claim that the City engaged in a municipal policy to deprive African-American firefighters of the same promotional opportunities offered to White firefighters. *Id.* at *6. Finally, the court found that the City had presented sufficient evidence to raise genuine issues of fact regarding whether the Exam was job-related and consistent with business necessity, thereby precluding partial summary judgment in plaintiffs' favor on their disparate impact claim under Title VII and setting the stage for the validation hearing. *See id*. at *6-*7,

The hearing took place over the course of five days in July and August, 2008. Dr. Wendy Steinberg and Mr. Paul Kaiser testified about the services they performed as the

New York State Department of Civil Service officials charged with the task of developing the 1998 Lieutenant's Exam. The court also heard testimony from plaintiffs' employment testing expert, Kevin R. Murphy, Ph.D., and from the City's Director of Civil Service, Ms. Olivia Licata.

On March 9, 2009, the court issued its decision finding that the proof presented at the hearing was sufficient to show that the 1998 Lieutenant's Exam was developed "in a manner that is significantly correlated with important elements of work behavior which are relevant to the position of fire lieutenant as performed in the City of Buffalo," and that "the City has met its burden of demonstrating that the Exam is job-related for the position and consistent with business necessity . . . ." *M.O.C.H.A. Society*, 2009 WL 604898, at *18. Based on these findings, the court dismissed plaintiffs' claim that the City's use of the Exam to establish a list for promotion to the rank of fire lieutenant resulted in unlawful disparate impact under Title VII.

The City has now renewed its request for summary judgment dismissing the remaining claims of intentional discrimination set forth in Second Amended Complaint "B." For the reasons that follow, the court grants this request.

## DISCUSSION

I.  **Summary Judgment**

To briefly reiterate the standard, summary judgment under Rule 56 of the Federal Rules of Civil Procedure "is appropriate when the pleadings and admissible evidence proffered to the district court show that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .'" *Major League*

*Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)(2)). Facts are "material" if they "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).

In considering a motion for summary judgment, the court must construe the facts in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). The moving party bears the initial burden of establishing "that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). Then the burden shifts to the nonmoving party to come forward with evidence "sufficient to satisfy every element of the claim." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Resid. Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

In support of its renewed motion, the City contends that the court's March 2009 decision finding the use of the 1998 Lieutenant's Exam to be a valid, non-discriminatory

employment practice has eliminated the primary basis for plaintiffs' intentional discrimination claim—*i.e.,* the knowing use of a discriminatory examination—and that the proffered anecdotal evidence is insufficient to establish the elements required to succeed on a claim for relief based on allegations of discriminatory treatment by a municipal defendant. Plaintiffs respond that they can prove intentional discrimination by showing that the City knew the examination had a disparate impact but continued to use it as a basis for promotions in the face of expert evidence of the Exam's invalidity.

## II. Municipal Liability for Intentional Discrimination

The requirements for successfully pleading and proving intentional discrimination on the part of a municipal defendant under Title VII, § 1981, and the Equal Protection Clause of the U.S. Constitution were recently examined, in a relatively similar context, by Judge Nicholas G. Garaufis in *United States v. City of New York*, ___ F. Supp. 2d ___, 2010 WL 234768 (E.D.N.Y. January 13, 2010). In that case, the federal government and a group of African-American firefighters brought suit challenging New York City's hiring procedures for entry-level positions in the fire department. The plaintiffs claimed that the written examinations used by the defendant to screen and rank-order applicants had a disparate impact upon African-American and Hispanic candidates and were not job-related for the position in question or consistent with business necessity, resulting in intentional discrimination in violation of Title VII, § 1981, the Equal Protection Clause (actionable under § 1983), and the NYHRL.

In a series of thorough and thoughtful opinions, Judge Garaufis first granted summary judgment in favor of the plaintiffs on their disparate impact claim, finding that the

use of the written examinations resulted in "systemic disparities of statistical and practical significance in the pass/fail rates and eligibility list rankings of minority candidates," and that the defendant "failed to raise a triable issue that this disparate impact was the result of business necessity." *United States v. City of New York*, 637 F. Supp. 2d 77, 131, 132 (E.D.N.Y. 2009). The court then took on the intentional discrimination claims, ultimately finding that the plaintiffs had successfully "marshaled extensive statistical, testimonial, and anecdotal evidence to create a prima facie case that the City's examination policies constituted a pattern or practice of intentional discrimination," and that the defendant had "failed to raise a triable issue of fact with respect to either the [plaintiffs]' prima facie case or its own evidentiary burden . . . ." *City of New York*, ___ F. Supp. 2d at ___, 2010 WL 234768 at *38. As a result, the court granted summary judgment in favor of the plaintiffs on their claims of intentional discrimination brought under the Equal Protection Clause, Title VII, § 1981, and the NYHRL. *Id.*

Similar to the claims addressed in the *City of New York* case, plaintiffs here assert that the City of Buffalo's use of the 1998 Lieutenant's Exam to develop a promotion eligibility list constitutes a pattern or practice of intentional discrimination against African-American candidates, in violation of Title VII, § 1981, and the Equal Protection Clause. As explained in *City of New York*, this type of "disparate treatment" claim:

> differs significantly from the "disparate impact" claim previously litigated . . . . Whereas disparate impact liability can be established by proof that an employer's policy had unjustified adverse effects on a protected group, a disparate treatment claim requires additional proof that the challenged policy was adopted with the intent to discriminate against the protected group. In pattern-or-practice disparate treatment cases, plaintiffs must establish by a preponderance of the evidence that the defendant took the challenged action "because of" its adverse effects on the protected class, and that such

intentional discrimination was the defendant's "standard operating procedure."

Id. at *13 (citing Ricci v. DeStefano, ___U.S.___, ___, 129 S.Ct. 2658, 2672-73 (2009); quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985-986 (1988), and Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)).

Supreme Court precedent provides a framework for allocation of burdens and order of presentation of proof in a Title VII "pattern or practice" discriminatory treatment case that is "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n.8 (1981); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1977). The plaintiff bears "the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion . . .," Teamsters, 431 U.S. at 358.

> And, because it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the [plaintiff] ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the [defendant]'s standard operating procedure–the regular rather than the unusual practice.

Id. at 336. If the plaintiffs make out a prima facie case of discriminatory pattern or practice, "[t]he burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." Id. at 360.

Judge Garaufis found in the City of New York case that the undisputed statistical evidence of disparate impact, supplemented by "extensive historical, anecdotal, and

testimonial evidence that intentional discrimination was the City's 'standard operating procedure,'" *City of New York*, ___F. Supp. 2d at ___, 2010 WL 234768 at *17 (quoting *Teamsters*, 431 U.S. at 336), was sufficient to establish "a prima facie case that the City used the exams to discriminate against black applicants—in other words, that the exams illegally harmed black test-takers." *Id.* at *21. The burden therefore shifted to the City to demonstrate that the plaintiffs' proof "'is either inaccurate or insignificant' by attacking its 'source, accuracy, or probative force.'" *Id.* at *18 (quoting *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 159 (2d Cir. 2001)). Upon consideration of the summary judgment record, the court found that the City had failed to sustain its burden of production. According to Judge Garaufis, "[t]he City has not offered a competing 'statistical summary treatment of the protected class,' has not attempted to undermine the [plaintiffs]' statistics with 'specific attacks on [their] validity,' and has garnered no 'anecdotal [or] other non-statistical evidence tending to rebut the inference of discrimination.'" *Id.* (quoting *Robinson*, 267 F.3d at 159). Instead, in an effort to demonstrate lack of discriminatory intent, the City submitted statements of the individuals who were principally responsible for developing the examinations at issue, which the court rejected as "patently inadequate" to rebut the plaintiffs' prima facie case. *Id.* at *20. Judge Garaufis noted:

> The [plaintiffs] are not challenging the existence or utility of the exams per se; they are challenging the City's policy or practice of using the exams as pass/fail and rank-ordering devices. For purposes of the [plaintiffs]' claim, then, it does not matter whether the City requires firefighter candidates to take a written exam, complete the Sunday crossword puzzle, or navigate a hedge maze: what matters is (1) whether the City has policies of screening and ranking applicants based on how well they perform the required task, (2) what effect those policies have on black applicants, and (3) why the City decided to adopt those policies. Thus, the subjective motives of the people who *designed* the Exams are only circumstantially relevant to the question

> of whether the City's *decision to use* the Exams as screening and ranking devices was discriminatory. On the other hand, a showing that the Exams were *constructed properly*—that is, that they test for relevant job skills and properly differentiate between better and worse candidates—would be highly relevant to the City's defense because it would support an inference that the City's actual intent in enforcing the pass/fail and rank-ordering policies was to select the best candidates, and that the [plaintiffs]' prima facie showing of disparate impact is merely the unfortunate by-product of a legitimate, neutral policy.

*Id.* at *21 (emphasis in original).

In this case, the clear import of the court's March 9, 2009 ruling is that the 1998 Lieutenant's Exam has been shown by a preponderance of the evidence and testimony presented at the five-day validation hearing to be job-related for the position of fire lieutenant in the City of Buffalo and consistent with business necessity. Therefore, the City's use of the Exam to establish the promotion eligibility list does not constitute an unlawful employment practice based on disparate impact under Title VII. As a result, the disparate impact of the Exam (in the words of Judge Garaufis) "is merely the unfortunate by-product of a legitimate, neutral policy," and thus plaintiffs' offer of proof regarding the City's intent to use the Exam despite its known disparate impact is insufficient in and of itself to be considered "adequate to create an inference that [the] employment decision was based on a discriminatory criterion . . . ." *Teamsters*, 431 U.S. at 358.

Accordingly, in order to make a sufficient prima facie showing on their disparate treatment claims, plaintiffs must come forward with some other form of admissible evidence to demonstrate that it was the City of Buffalo's practice, policy, or "standard operating procedure" to discriminate against African-Americans in promoting firefighters to the rank of lieutenant. *Teamsters*, 431 U.S. at 336. After twelve years of litigation, the

record before the court reveals only the anecdotal deposition testimony of six named class representative plaintiffs, summarized here as follows:[1]

- Willie Broadus: Mr. Broadus testified that he took the lieutenants' examination once, in 1992. He did not take the 1998 Lieutenants' Exam (*see* Item 419, Ex. B).

- Robert Grice: Mr. Grice testified that the lieutenants' exam applications were time-stamped by the City upon receipt, and that the time of receipt was referred to as a tie-breaker for rank-ordering applicants who received the same score on the exam. According to Mr. Grice, the City allowed White individuals to submit applications on behalf of others. He did not know if there was a rule requiring applications to be submitted in person, and he was not aware of any instance in which an African-American firefighter attempted to submit an application on behalf of another and was not permitted to do so. He did not know of any White firefighters who had benefited from this process. He also testified that he was aware of informal exam preparation sessions being conducted by groups of White firefighters, and that minorities were not invited to attend, but he never actually witnessed one. Instead, he had heard about them through M.O.C.H.A., and specifically from one African-American member, Darryl Wiggins, who was in fact invited to attend the preparation sessions (*see id.*, Ex. C).

---

[1] Notably, the deposition transcript excerpts summarized here were submitted by the City in connection with both their previous and current motions for summary judgment on plaintiffs' intentional discrimination claims (Item 260, Exs. B-G; Item 419, Exs. B-G). Plaintiffs have not submitted any further transcript excerpts to provide a more complete testimonial context, or to otherwise support their disparate treatment or intentional discrimination claims.

- Walter Jones: Mr. Jones testified that in the 1980s, White firefighters were given booklets to help them prepare for the lieutenants' examination, but African-American firefighters were not (*see id.*, Ex. D).

- Victor Muhammad: Mr. Muhammad testified that White firefighters were notified of the examination before African-American firefighters, and that they were therefore able to submit their applications first, giving them an advantage on the tie-breaker. He also testified that on one occasion he witnessed a Fire Captain giving a tutoring class at a firehouse, which was attended only by White firefighters. He did not ask if he could participate, since he was on duty at the time. He did not know the names of any of the firefighters in the class, and could not recall what year this took place (*see id.*, Ex. E).

- William Raspberry: Mr. Raspberry testified that he took the Lieutenant's Exam in the late 1980s and early 1990s, but did not take the 1998 Exam. He witnessed an incident in which White firefighters were given access to actual exam questions and answers in advance. He also testified that there were informal study groups that took place in his firehouse. These groups were limited to White firefighters. They were not sanctioned by the Fire Department. Mr. Raspberry never complained to anyone in Fire Department management about this (*id.*, Ex. F).

- John Tucker: Mr. Tucker testified that he was the president of M.O.C.H.A. at the time of the administration of the 1998 Exam. He had many conversations with firefighters about their "personal beliefs" that there was bias against African-Americans, but he had no first-hand knowledge of any discriminatory practices.

Drawing all reasonable inferences in plaintiffs' favor, this summary of the deposition testimony demonstrates that plaintiffs have failed to come forward with evidence sufficient to establish the "standard operating procedure" requirement of their municipal liability claim. First of all, there are no facts to be found in the deposition testimony or elsewhere in the summary judgment record to support the allegation that the City automatically listed White rookies ahead of African-American rookies, kept retirement-eligible firefighters on active duty, awarded seniority to White provisional employees, or refused outright to promote eligible African-American applicants. Likewise, there is no evidence in the record to support the claim that the City advantaged White firefighters by allowing their test applications to be submitted before the applications of African-Americans. Even assuming that this policy or practice existed, plaintiffs have not identified a single firefighter who was either advantaged or disadvantaged by it.

With respect to plaintiffs' claim that the City conducted examination training sessions that were restricted to White firefighters, the deposition testimony reveals that any such training sessions were informal, not City-sponsored.

Finally, there is no evidence in the record to support the inference that the single incident witnessed by Mr. Raspberry regarding White firefighters' access to test questions in advance of the examination was in any way sanctioned by the City.

In summary, while the court was not in the position to preclude plaintiffs from relying on the anecdotal deposition testimony as circumstantial support for their municipal policy claim prior to the validation hearing, it finds itself in that position now. Based on the law of the case that the 1998 Lieutenant's Exam has been shown to be job-related and consistent with business necessity notwithstanding its disparate impact, and given the

paucity of proof of discrete acts of intentional discrimination attributable to municipal policy, the court finds that plaintiffs have failed to satisfy their prima facie burden "to establish by a preponderance of the evidence that racial discrimination was the [City]'s standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336. Accordingly, no rational jury could find in favor of plaintiffs on their disparate treatment claim,[2] and defendants are entitled to summary judgment as a matter of law.

## **CONCLUSION**

Based on the foregoing, defendants' motion for summary judgment (Item 418) is granted, and Second Amended Complaint "B" is dismissed in its entirety.

So ordered.

\s\ John T. Curtin<br>
JOHN T. CURTIN<br>
United States District Judge

Dated: May 7 , 2010
p:\pending\98-99.apr16.10

---

[2] The court's finding of inadequate evidence to support a prima facie case of municipal liability under Title VII applies equally to, and mandates dismissal of, plaintiffs' intentional discrimination claims brought under 42 U.S.C. §§ 1981 and 1983, and the NYHRL. *See City of New York*, ___F. Supp. 2d. at ___, 2010 WL 234768 at *22-23, *33 (citing cases).