UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

M.O.C.H.A. SOCIETY, INC., et al.,

                              Plaintiffs,

              -vs-                                   98-CV-99-JTC

CITY OF BUFFALO, et al.,

                              Defendants.
_____


        In Third Amended Complaint "A" in this case (Item 247), plaintiffs M.O.C.H.A.

Society Inc. ("MOCHA") and seventeen employees and/or former employees of the City

of Buffalo Fire Department claim that the Fire Department's drug testing policy, in effect

between approximately 1995 and 2005, was implemented, applied and enforced in a

manner designed to intentionally discriminate against African American firefighters, in

violation of  42 U.S.C. §§ 1981, 1983 and 2000e-2 ("Title VII"), and the New York Human

Rights Law ("NYHRL"), N.Y. Exec. Law § 296.  Following an extended period of discovery,

the City and the Union moved for summary judgment dismissing Third Amended Complaint

"A."  For the reasons that follow, these motions are granted.


## BACKGROUND

        The following factual background is derived from the pleadings, affidavits, discovery

materials, and other submissions on file, including the parties' respective statements of fact

submitted pursuant to Rule 56(a) of the Local Rules of Civil Procedure for the Western

District of New York.

The Drug Testing Policy of the Buffalo Fire Department was drafted by the Professional Firefighters Association, Local 282 (the "Union") as the result of negotiations between the Union and the City "to complete obligations contained in an interest arbitration decision." Item 469, Ex. 5[1] (Copy of Drug Testing Policy), p. 12.  It was enacted in June 1995 upon signature by representatives of the Union, The Fire Department, and the City of Buffalo Division of Labor Relations. The stated general purpose of the Drug Testing Policy was to address concerns about the effects of "on-the-job impairment due to drug abuse …," including "lost productivity, increased health care costs, increased absenteeism, and … danger to the safety of fellow workers and to the public." *Id.* at 1.

Under the Drug Testing Policy, Fire Department personnel were divided into testing groups as determined by employment status, and were subjected to random urinalysis using a "bingo machine" selection procedure.  The drug testing methodology, mutually agreed upon by the parties, involved obtaining a urine sample from the subject employee and dividing the sample into two equal parts, one of which would be retained at the collection center while the other would be sent to a testing laboratory under chain of custody procedures.  Confirmed positive test results would be referred to a Medical Review Officer ("MRO"), who would review the results and chain of custody documents and give the employee who tested positive an opportunity to discuss them.  If the MRO concluded that there was no medical reason for the positive result, the test would be verified as positive and reported to the Deputy Commissioner and the Employee Assistance Program ("EAP") Coordinator.  The second sample would then be submitted for testing, and the

---

[1] Unless otherwise noted, references preceded by "Ex." are to the Exhibits attached to Item 469, Declaration of Joseph S. Brown in Support of the City's Summary Judgment Motion.

employee would be sent to a treatment center for rehabilitation.   While undergoing treatment, the employee was required "to utilize all paid leave credits (vacation, personal) before utilizing paid sick leave." Ex. 5, p. 10.

If the second test result was positive, the employee would be deemed to have waived any right to challenge the testing protocol for either sample.  The employee would be subject to discipline, including discharge, for the following reasons: two positive test results; failure to complete a rehabilitation program following entry after a first confirmed positive test result; failure to materially comply with the terms of the rehabilitation program; or, testing positive, as confirmed by an MRO, after entering or completing a rehabilitation program.   Prior to any discipline being imposed, the employee would be entitled to a hearing before the Commissioner, and afforded an opportunity to offer an explanation in mitigation of the proposed discipline. *Id.* at 2-12; *see also* Item 471 (City Defts. Local Rule 56 Statement), ¶¶ 1-16.

On February 10, 1998, MOCHA filed the original complaint in this lawsuit seeking certification of a class action against the City; the Fire Department; Fire Commissioner Cornelius Keane; and Deputy Commissioner John Sixt (the "City defendants"), alleging racial discrimination based on the Fire Department's (1) implementation and application of the Drug Testing Policy, and (2) administration of the 1998 promotional examination for fire lieutenant. *See* Item 1.  Shortly thereafter, the Union moved to intervene as a party defendant to protect its rights as the Buffalo firefighters' bargaining representative.  The court subsequently granted plaintiffs leave to amend the complaint to assert additional claims, including a claim that the Union and Local 282 President Ronald Cassell (the

"Union defendants") took action against the plaintiffs in retaliation for bringing this lawsuit against the City.  *See* Item 10, ¶¶ 65-68.

After meeting with counsel, the court determined that the drug testing and promotion issues should be addressed in separate pleadings.  *See* Item 23.  Accordingly, in October 1998, plaintiffs filed "Amended Complaint A" dealing with the Drug Testing Policy (Item 24) and "Amended Complaint B" dealing with the promotion policy (Item 25).

On October 19, 2000, following substitution of plaintiffs' counsel (and upon consent of the City defendants), plaintiffs filed Second Amended Complaints "A" (Item 55) and "B" (Item 54), and the City moved to dismiss both complaints.  Second Amended Complaint "A" contained the following nine causes of action:

1.   The Drug Testing Policy is arbitrary and capricious on its face and violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2.   The Drug Testing Policy is arbitrary and capricious as applied to plaintiffs and violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

3.   The Drug Testing Policy on its face violates plaintiffs' right to privacy guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

4.   As applied, the Drug Testing Policy violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

5.   By the conduct alleged, defendants violated 42 U.S.C. §§1981and 1983.

6.   By the conduct alleged, defendants violated Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII") *et seq*. as amended 42 U.S.C. 2000e, *et seq*.

7.   By the conduct alleged, defendants violated 42 U.S.C. §1985.

8.   By the conduct alleged, defendants violated New York's Human Rights Law, Executive Law 296, et. seq.

9.    By the conduct alleged, the defendants were aiders and abettors in violation of New York's Human Rights Law, Executive Law 296(6).

In a decision and order dated March 16, 2002, the court granted the City's motion to the extent it sought dismissal of plaintiffs' conspiracy claims brought under 42 U.S.C. § 1985(3); claims for punitive damages against the City and the individual City defendants sued in their official capacities; Title VII claims against individual City defendants Cornelius Keane and John Sixt; and claims against the Fire Department as a separate entity. *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 199 F. Supp. 2d 40, 52-53 (W.D.N.Y. 2002).  On March 26, 2003, the City filed an answer to Second Amended Complaint A, denying all material allegations and asserting numerous affirmative defenses.  *See* Item 146.  By order entered on November 25, 2003, this court granted as unopposed the City's cross-motion to deem the class allegations in Complaint "A" abandoned and waived.  *See* Items 184, 186.

On July 26, 2006, the court granted as unopposed plaintiff's request for leave to file a Third Amended Complaint "A" (Item 247), adding Robert Jones as a plaintiff and bringing to seventeen the number of individual plaintiffs claiming that they were intentionally discriminated against by the City and the Union as a result of the implementation, administration, and enforcement of the Drug Testing Policy.  The parties then engaged in further discovery, including taking the depositions of all seventeen individual plaintiffs. What follows is a summary of this deposition testimony along with a brief discussion of the evidence pertaining to each individual plaintiff's claims.

### 1.    Maurice Birdsong

Mr. Birdsong was deposed on January 24, 2007.  He testified that he joined the Buffalo Fire Department as a firefighter in 1991.  He was randomly drug tested by the Fire Department once in 1996.  At the time, he was generally aware of the Department's Drug Testing Policy, but he did not know he would be tested until the day of the test.  Ex. 7 (Birdsong Dep.), pp. 8-12.

Mr. Birdsong testified that the test was administered at ECMC.  He went there with three other members of his crew, all African Americans.  He filled out paperwork, and provided a urine sample.  Two or three days later, he was informed by his captain that his test had come back positive.  He was referred to an EAP drug counselor, who told him that he had to attend inpatient drug treatment at Hope House in Rhode Island.  Mr. Birdsong immediately reported to Hope House, and completed a twenty-eight day program of group therapy and individual counseling.  *Id.* at 13-21.  He described Hope House as a "nice treatment center," but explained that he had "nothing to compare it to" since he had never been to a drug treatment center before.  *Id.* at 21.

After he completed the inpatient treatment program, Mr. Birdsong returned to active duty as a firefighter and  enrolled in outpatient treatment at the Ellicott Square location of the Beacon Center.  As a component of this treatment, Mr. Birdsong was administered drug tests on a regular basis. He testified that one of the tests came back positive about three weeks into his outpatient  treatment.  He subsequently met with Deputy Sixt and two others at Fire Department  headquarters, where he was informed that his employment was terminated.  *Id.* at 22-24.

In a written Commissioner's Determination dated July 6, 1996, Commissioner Keane reported that Mr. Birdsong was charged with violating the Drug Testing Policy by testing positive for drugs while participating in the rehabilitation program, after first testing positive pursuant to the Department's random drug testing program.  *See* Ex. 8, p. 29.   He received written notice of the charges and requested a hearing, which was held at Department headquarters on June 26, 1996.   According to the Commissioner's Determination, evidence was presented at the hearing showing that Mr. Birdsong  had tested positive for cocaine on five occasions while attending outpatient treatment at the Beacon Center.   He stopped attending treatment in May 1996.   He admitted during the hearing that he had used drugs during treatment.   Based on this evidence, the Commissioner found that Mr. Birdsong's "repeated and serious violations of the Drug Testing Policy and the terms and conditions of the counseling/rehabilitation program, his failure to complete the counseling/rehabilitation program, and his positive test results … , warrant the most serious penalty."  *Id.* at 30.   Accordingly, Mr. Birdsong was discharged from employment effective June 26, 1996.  *Id.*  He did not file a grievance to challenge his termination.  Ex. 7, p. 26.

###    2.    Otto Brewer, Jr.

Mr. Brewer was deposed on March 7, 2007.   He became a firefighter with the Buffalo Fire Department in 1988.   He testified that he was subjected to random drug testing on several occasions, and was informed on two separate occasions that his drug tests came back positive.   The first positive test occurred in December 1995.   He was at home and off duty when he received a phone call from Deputy Sixt, who ordered him to go to

ECMC to take a drug test.  He was immediately picked up by two other firefighters in a Department vehicle and taken to ECMC.  He provided a urine sample to an ECMC staff member, who labeled the sample and placed it in a plastic bag.  He was subsequently informed by Sixt that the test results were positive, and he met with Sixt and Union President David Donnelly to discuss the results and treatment options.  He was given the option of  attending inpatient or outpatient treatment, and he chose to enroll in outpatient treatment at the Beacon Center beginning in January 1996. Ex. 9 (Brewer Dep.), pp. 16-23.

Mr. Brewer's outpatient treatment at the Beacon Center consisted of support group meetings three times a week, and periodic drug testing.  On May 10, 1996, Beacon Center Counselor Matthew Guarino wrote a letter to Deputy Sixt informing him that Mr. Brewer left the Beacon Center without supplying a urine sample on April 16, 1996.  Then, on April 23, 1996, Mr. Brewer provided a urine sample which tested positive. *See* Ex. 11.  He testified that he received a forty-five day suspension, and entered "Phase 2" of treatment at the Beacon Center.  He returned to active duty upon  successful completion of his treatment. Ex. 9, p. 37.

Mr. Brewer was tested again on May 26, 1997, and once again the test was positive for drugs.  On June 3, 1997, Deputy Sixt sent a letter to Brewer notifying him that he was suspended without pay as of June 4, 1997, and was "subject to discipline up to and including termination of employment …." Ex. 12.  He requested a hearing, which was held on July 25, 1997.  As a result of the hearing, Mr. Brewer was terminated from employment for testing positive for drugs after entering rehabilitation; failing to comply with treatment

at the Beacon Center; and subsequently testing positive on a random drug test.  *See* Item 469, ¶ 75.

Mr. Brewer filed a charge with the Equal Employment Opportunity Commission ("EEOC") challenging his termination, claiming the Fire Department discriminated against him because of his race.  On September 22, 1997, the EEOC issued a "Dismissal and Notice of Rights" informing Mr. Brewer that, based on its investigation, the EEOC was unable to conclude that a violation of any federal employment discrimination statute had occurred.  Ex. 15.

Mr. Brewer also filed a series of grievances with the Fire Department and the New York State Public Employment Relations Board ("PERB"), which were ultimately resolved by virtue of a Settlement Agreement with the City, dated February 7, 2000, providing for Mr. Brewer's reinstatement to active duty upon entry into an outpatient rehabilitation program, participation in a 12-step self-help program, and clean urine screening.  Ex. 14. Mr. Brewer returned to active duty with the Fire Department on February 17, 2000.  Ex. 9, p. 56.

### 3.    Michael Anthony Brown

Mr. Brown was deposed on October 22, 2003 and November 19, 2003.  He began his career as a firefighter with the Buffalo Fire Department  in 1982.  He testified that he was tested for drugs under the Fire Department's policy three times prior to October 1999, twice in 2000, twice in 2001, and twice in 2002.  Ex. 16 (Brown Dep.), pp. 20-21.

Mr. Brown testified that, on October 22, 1999, he traveled to ECMC with other members of his crew to be tested pursuant to the Department's Drug Testing Policy.  He

provided a urine sample to the collection agent, who separated the sample into two cups.

He asked the agent whether the sample was sufficient, and was told that it was. He was

subsequently informed that this sample tested positive for drugs. *Id.* at 21-22; *see also* Ex.

17. Confirmatory retesting was also positive. *See* Ex. 18.

Mr. Brown testified that, following receipt of the positive test results, he met at

various times with Deputy Commissioner John Lydon; Mr. Donnelly; EAP Coordinator

Vincent Gugliuzza; and the MRO, Dr. Steinagle, to discuss the test result and treatment

options. Mr. Brown began attending an outpatient treatment program at Buffalo General

Hospital on November 4, 1999. He testified that he attended treatment three to four times

per week for a total of twelve to sixteen weeks. He provided urine samples on some of

those occasions as part of his treatment program. He was on paid sick leave status for the

entire period. *See* Ex. 16, pp. 51-52, 54-56, 59-64, 73.

After successfully completing his outpatient treatment, Mr. Brown returned to active

duty as a  firefighter. All of his subsequent tests under the Drug Testing Policy were

negative for drugs. He was never suspended or terminated by the Fire Department. *See*

*id.* at 80,126, 266-267.

### 4.    Walter L. Davis

Mr. Davis was deposed on January 31, 2007. He was employed as a firefighter by

the Buffalo Fire Department from 1984 to 1997. During his employment, he was tested

under the Department's Drug Testing Policy on two occasions.   After the results of the

second test came back positive, he met with Deputy Sixt and Mr. Donnelly to discuss the

positive test results. Mr. Davis testified that he asked to be retested, but was refused. He

was told that he had to attend drug treatment, and was sent to an inpatient treatment program at the Brandywine Treatment Center in Pennsylvania.  *See* Ex. 19 (Davis Dep.), pp. 18, 24, 26-28.

After completing inpatient treatment at Brandywine, Mr. Davis returned to work as a firefighter.  He was informed by the EAP coordinator that he had to attend outpatient treatment at the Beacon Center in the Ellicott Square Building.  Treatment included group counseling and drug testing.  *Id.* at 31-36.

On December 16, 1996, Deputy Sixt sent Mr. Davis a notice advising him that he was being suspended without pay for violating the Drug Testing Policy, and would be terminated from employment as of December 30, 1996.  A hearing was scheduled for May 12, 1997, to address this charge.  In the meantime, progress reports from the Beacon Center indicated that urine samples submitted by Mr. Davis in December 1996 and March 1997 had tested positive for drugs, and that Mr. Davis had failed to attend several treatment sessions.  Ex. 20, p. 24-25.

In a Determination dated June 13, 1997, Commissioner Keane found that the evidence presented at the hearing established that Mr. Davis repeatedly tested positive for drug use, and failed to comply with the requirements of his treatment program, warranting "the most serious penalty" of discharge from employment, effective as of the date of the Determination.  Ex. 24.  Mr. Davis did not file a grievance or otherwise challenge this Determination prior to the filing of this action.

### 5.      David Gray

Mr. Gray was deposed on January 22, 2007.  He testified that he was employed as a firefighter with the Buffalo Fire Department from 1988 until he resigned in1997.  During his employment with the Fire Department, he was tested for drugs more than once under the Drug Testing Policy.  He participated in two outpatient treatment programs at the Beacon Center.  The first occurred prior to the Fire Department's implementation of the Drug Testing Policy, and the second took place pursuant to the Policy following a twenty-eight day course of inpatient rehabilitation in Salt Lake City, Utah.  *See* Ex. 25 (Gray Dep.), pp. 8-9, 15-16, 20-23.

Mr. Gray testified that, upon successful completion of inpatient treatment in Utah, he resumed active duty as a firefighter and enrolled in the outpatient treatment at Beacon Center for the second time.  Sometime later, Mr. Gray was summoned to Fire Headquarters where he met with Deputy Sixt, Commissioner  Keane, and Mr. Donnelly.  Mr. Gray testified that one of these individuals told him that he had violated the Drug Testing Policy and could either resign or be terminated from his firefighter position.  *Id.* at 23-28.

By letter dated June 13, 1997, Deputy Sixt notified Mr. Gray that he had been suspended without pay for violating the terms of the Drug Testing Policy regarding completion or material compliance with the requirements of the drug rehabilitation program.  Ex. 28.  The letter also advised of the right to request a hearing to offer an explanation in mitigation of the proposed discipline.  *Id.*  The record does not reflect whether Mr. Gray requested a hearing, filed a grievance with the Union, or did anything to challenge the

Policy violation charge lodged against him prior to the filing of this action.  *See id.* at 31-32, 36.

### 6.      Arthur L. Harris

Mr. Harris was deposed on April 12, 2007.  He testified that he joined the Buffalo Fire Department as a firefighter in 1986, and  was terminated by the Department in early 1999.  He was tested for drugs pursuant to the Drug Testing Policy, and was informed that two of these tests were positive for illegal drugs.  *See* Ex. 29 (Harris Dep.), pp. 10-14.

Mr. Harris testified that the first positive test was in July 1997.  He took this test at ECMC with other members of his crew.  Approximately three days after the test, he received a phone call at the firehouse from Deputy Sixt, who told him to get in touch with the MRO.  Mr. Harris phoned the MRO, and was informed that his sample had come back positive.  He was then told by someone in the Fire Department that he was required to enroll in the outpatient drug treatment program at the Beacon Center.  *See id.* at 14-18.

Mr. Harris testified that he attended outpatient treatment at the Beacon Center three times per week.  His treatment included regular urine screenings and group meetings.  He remained on active duty with the Fire Department throughout his outpatient treatment, except for a period of medical leave for sinus surgery lasting three to four weeks.  Upon his return to active duty in December 1997, he was again tested for drugs at ECMC, and was informed by the MRO that this test was positive.  *See id.* at 19-23.

By letter dated January 5, 1998, Deputy Sixt informed Mr. Harris that he was being suspended without pay for failing to comply with the Beacon Center's rules and regulations, in violation of the Drug Testing Policy.  The letter also advised him of his right to a hearing.

-13-

Ex. 32.  In a progress report dated January 14, 1998, the Beacon Center informed Deputy

Sixt that Mr. Harris did not provide urine samples from November 1, 1997 to December 26,

1997, because he believed he was not required to give samples while on medical leave.

The report also states that Mr. Harris provided a urine sample on January 9, 1998, which

tested positive.  Ex. 33.

Mr. Harris requested a hearing, which was  held on February 3, 1998.  In a

Determination dated  February 27, 1998, Commissioner Keane found that, based on the

evidence presented at the hearing, Mr. Harris' positive drug tests and failure to comply with

the terms of the rehabilitation program resulted in "serious violations of the Drug Testing

Policy warrant[ing] the most serious penalty" of termination from employment, effective

February 3, 1998.  Ex. 34.

On March 9, 1998, the Union filed a grievance on behalf of Mr. Harris claiming that

the termination of his employment while he was still in the rehabilitation program violated

the terms of the Drug Testing Policy and the Collective Bargaining Agreement ("CBA")

between the Union and the City.  This grievance was denied by letter dated March 20,

1998.  *See* Ex. 35.  The Union then filed a Demand for Arbitration (*see* Item 473-5, p. 41),

which was conducted on November 22, 1999.  Item 473-2, ¶ F(12).  Mr. Harris testified

that, at the time of his deposition on April 12, 2007, he was still awaiting the arbitrator's

decision.  Ex. 29, p. 40.

### 7.    Robert E. Jones, Sr.

Robert Jones was deposed on January 19, 2007.  He testified that he joined the

Buffalo Fire Department as a firefighter in 1981, and remained with the Department until

he was terminated in 1996.  In or around October 1995 he was tested for drugs at ECMC, along with other members of his crew at Engine 23.  Shortly thereafter, he received a call at the firehouse from Mr. Bagthe, a Union representative, requesting his presence at Union headquarters.  He went to see Mr. Bagthe the next day.  Mr. Batghe told him that he had tested positive, and that he would be sent to a treatment center in Rhode Island for rehabilitation.  *See* Ex. 36 (R. Jones Dep.), pp. 9-21.

Robert Jones testified that he attended inpatient treatment in Rhode Island for thirty days. Treatment consisted mainly of group therapy sessions.  Upon completion of the inpatient program he returned to active duty as a firefighter and enrolled in outpatient treatment at the Beacon Center's Ellicott Square location.  He attended the Beacon Center program for about three weeks.  During this time he was tested for drugs, and was informed on more than one occasion that his tests had come back positive.  He admits that he relapsed while in the outpatient treatment program, due to the death of his parents and the stress of his "disease."  *See id.* at 23, 27, 37-38.

Robert Jones testified that he was working the night shift one night when the district chief came to the firehouse and told him to go home.  Jones thereafter received a letter from the Fire Department requesting his presence at a disciplinary hearing.  He was terminated from his employment following the hearing.  He testified that he filed a grievance with the Union to contest his termination, but no action was taken.  *Id.* at 28-29, 48-49.

### 8.    Walter Jones, Jr.

Walter Jones, Jr., was deposed on January 26, 2007.   He testified that he joined the Buffalo Fire Department as a firefighter in April 1983, and was assigned to Engine 33. He was still employed by the Department–and still assigned to Engine 33–at the time of his deposition.

Mr. Jones was tested for drugs under the Department's Drug Testing Policy on several occasions.   Following one of those tests, he received a call from Deputy Sixt informing him that  his sample had tested positive.   He subsequently met with Deputy Sixt either at Fire Headquarters or the Union office, whereupon Sixt told Mr. Jones that he had to sign papers consenting to drug treatment and attend rehabilitation, or be fired.   Mr. Jones signed the papers, and thereafter entered outpatient treatment at the Beacon Center's Sheridan  Drive location. *See* Ex. 37 (W. Jones Dep.), pp. 9, 30-35.

Walter Jones testified that he attended outpatient treatment at the Sheridan Drive location of the Beacon Center for a number of months while remaining on active duty as a firefighter.   His treatment consisted of group and individual therapy, along with drug testing.   During this treatment he was informed that one of his urine samples had tested positive.   This result was reported to Deputy Sixt in a letter dated April 11, 1996, from Beacon Center Counselor Matthew Guarino.   The letter also reported that urinalysis of a sample taken on April 1, 1996, was positive for cocaine, codeine and morphine, which Walter Jones stated "was the result of the cough syrup and medication he was taking." Ex. 40, p. 8.   According to the letter, a second urine sample taken on April 2, 1996, was negative, but a third urine sample taken on April 4, 1996, was again positive for cocaine.

Counselor Guarino reported that Mr. Jones admitted using cocaine on April 1, 1996. *Id.*; *see also* Ex. 37, pp. 35-38.

On April 4, 1996, Deputy Commissioner John Sniderhan sent Walter Jones a letter advising that Jones had been suspended without pay for violating the Department's Drug Testing Policy, and further advising him of the right to a hearing. Ex. 41. He filed a grievance through the Union to challenge his suspension. The grievance was ultimately resolved by Settlement Agreement with the Department, dated August 28, 1998, reducing his term of suspension from 45 to 30 days with no back pay, and reinstating him to active duty with full pay. Ex. 42; *see also* Ex. 37, pp. 38-39, 44, 47.

### 9.    Edward Josey

Mr. Josey was deposed on January 3, 2007. He testified that he joined the Buffalo Fire Department as a firefighter on August 8, 1988. He retired on April 16, 2001 while on "Injured on Duty" ("IOD") status. *See* Ex. 43 (Josey Dep.), p. 8.

Mr. Josey testified that he was tested for drugs at ECMC in September 1996, along with his company of about fifteen firefighters assigned to Engine 23. Soon thereafter he received a phone call at home from Deputy Sixt informing him that his test was positive, and directing him to attend the outpatient treatment program at the Beacon Center in the Ellicott Square Building. Mr. Josey attended the program three times a week for approximately one year, while working light duty passing out pamphlets at City Hall. His treatment at Beacon Center consisted of counseling sessions and urine screenings. *Id*. at 18-19, 33-35; *see also* Ex. 45 (Lab. Report, 9/30/96).

As evidenced by laboratory reports submitted as exhibits to the City's summary judgment motion, a urine sample Mr. Josey provided to the Beacon Center on November 11, 1996, came back positive for marijuana; a sample he provided to the Beacon Center on September 9, 1997 came back positive for benzodiazepines; and, a sample he provided to the Beacon Center on December 4, 1997 came back positive for codeine. *See* Ex. 46. On January 5, 1998, the Fire Department sent Mr. Josey a letter notifying him that he had been suspended without pay for violating the drug testing policy, and advising him of his right to a hearing. Ex. 47. Then, on January 14, 1998, the Beacon Center sent Deputy Sixt a progress report advising that it had discharged Mr. Josey from the outpatient treatment program due to his unexcused failure to attend treatment sessions and failure to provide urine samples. Ex. 48.

Mr. Josey requested a hearing, which was held on February 3, 1998. In a written Determination issued on February 27, 1998, Commissioner Keane found the evidence presented at the hearing sufficient to establish that Mr. Josey tested positive for illegal drugs while undergoing outpatient treatment at the Beacon Center; failed to appear for scheduled treatment sessions without medical authorization; and failed to provide requested urine samples, in violation of the Drug Testing Policy. Accordingly, the Commissioner discharged Mr. Josey from employment effective February 3, 1998. Ex. 49.

The Union commenced an arbitration on Mr. Josey's behalf to challenge his suspension and discharge. On October 14, 1999, following full hearing on the merits, the arbitrator issued an Opinion and Award finding that the Fire Department had violated the Drug Testing Policy, and the CBA, by requiring Mr. Josey to attend drug rehabilitation sessions at the Beacon Center while he was taking prescribed medication during his

recovery from back surgery.  *See* Ex. 50.  The arbitrator directed that, upon successful completion of an approved rehabilitation program other than the Beacon Center, Mr. Josey was to be reinstated to his position with the Fire Department with full back pay and no loss of benefits.  *Id.*  Mr. Josey testified at his deposition that he enrolled in and successfully completed an approved rehabilitation program, was reinstated as a firefighter, and received full back-pay.  *See* Ex. 43, pp. 49-50.

### 10.   Harwyn M. Louie

Mr. Louie was deposed on December 13, 2006.  He testified that he began his career as a firefighter with the Buffalo Fire Department in 1985, and was terminated by the Department in July 1996 for violating the Drug Testing Policy.  He was tested for drugs at ECMC in December 1995, along with three other firefighters from his unit.  Shortly thereafter, he was informed by Deputy Sixt that his urine sample had tested positive, and that he would have to enter treatment.  *See* Ex.51 (Louie Dep.), pp. 14-16, 20-23.

Mr. Louie testified that he attended outpatient treatment at the Sheridan Drive location of the Beacon Center for approximately one month. His treatment consisted of group meetings and regular drug screening.  He found the Beacon Center meetings difficult, and he subsequently entered a 28-day inpatient treatment program at a facility located in Pennsylvania. Upon successful completion of the inpatient program, he returned to active duty with the Fire Department and resumed his outpatient treatment at the Beacon Center.  *See id.* at 24-26.

On February 26, 1996, Deputy Sixt sent Mr. Louie a letter notifying him that the Beacon Center had reported several unexcused absences from treatment sessions,

subjecting him to discipline for violating the Drug Testing Policy.   A hearing was subsequently scheduled for May 31, 1996, but was adjourned for two weeks to allow for reassessment of Mr. Louie's status upon resuming his participation in the Beacon Center outpatient treatment program.   On June 5, 1996, Mr. Louie tested positive for drugs, and the hearing was recommenced on June 26, 1996.   *See* Exs. 52, 53.   In a Determination dated July 5, 1996, Commissioner Keane found that the evidence presented at the hearing established "repeated and serious" violations of the terms and conditions of the treatment program; failure to complete the program; and positive drug test results after a second chance, warranting the "most serious penalty" of discharge from employment, effective as of the hearing date of June 26, 1996.   Ex. 53.

### 11.   Lawrence Pierce

Mr. Pierce was deposed on January 31, 2007.   He testified that he joined the Buffalo Fire Department as a firefighter in 1983, and retired in 2004.   He was first tested for drugs under the Fire Department's Drug Testing Policy in December 1995, and was informed that this test had come back positive.   He was directed to report to Union headquarters, where he met with Deputy Sixt and Mr. Donnelly and was told that he would have to attend a rehabilitation program.   Mr. Pierce thereafter attended a 28-day inpatient treatment program at a facility in Roanoke, Virginia.   Upon successful completion of this program, he returned to Buffalo and enrolled in outpatient treatment at the Beacon Center.   He resumed active duty status, and successfully completed outpatient rehabilitation.   *See* Ex. 54 (Pierce Dep.), pp. 6, 10-13, 15-18; *see also* Ex. 56.

On February 23, 2000, Mr. Pierce again tested positive during random drug testing. He was informed of the test result by Deputy Lydon, who phoned him at home and told him that he had been placed on sick leave.  Subsequently, on February 29, 2000, Deputy Lydon sent Mr. Pierce a letter notifying him of the charges against him, his suspension, and the scheduling of a hearing.  *See* Ex. 55.  The hearing was held on April 4, 2000, before Deputy Lydon and Commissioner Keane.   In a Determination dated April 15, 2000, Commissioner Keane found that Mr. Pierce violated the Drug Testing Policy by testing positive for illegal drugs a second time after first testing positive and undergoing rehabilitation, warranting his immediate discharge from employment.  Ex. 56.

Mr. Pierce filed a grievance to challenge his termination, and was subsequently reinstated by the Fire Department pursuant to an Award of Arbitration dated September 15, 2001.  *See* Ex. 54, pp. 32-36.  He testified at his deposition that his termination had nothing to do with the fact that he is African American, and that there was nothing about the way in which the drug testing policy was administered that was discriminatory toward African Americans.  *See* Ex. 54, pp. 36-37.

### 12.   William Raspberry

Mr. Raspberry was deposed on September 19, 2005.  He testified that he was employed by the Buffalo Fire Department as a firefighter from 1979 to 1997.  Ex. 57 (Raspberry Dep.), p. 8.  He was tested for drugs under the Department's Drug Testing Policy "twice, at the most …," and both tests came back positive for drugs.  *Id.* at 53.  The first drug test took place in October 1995.  *See* Ex. 61, p. 41.  He testified that he received a telephone call from someone at the Fire Department advising him that he had tested

positive, and directing him to report to Union headquarters to meet with Deputy Sixt and Mr. Donnelly.  As a result of this meeting, Mr. Raspberry was sent for outpatient drug treatment at the Beacon Center.  He attended daily outpatient treatment for three months, and was successfully discharged from the treatment program in February 1996.  *See id.* at 53-57; *see also* Ex. 61, p. 41.

Mr. Raspberry took his second drug test on September 23, 1997, at ECMC.  On September 25, 1997, Deputy Sixt sent Mr. Raspberry a letter informing him that he was being charged with violating the Drug Testing Policy by hindering the specimen collection procedure, and that he was suspended without pay "until a determination is made regarding this matter."  Ex. 59.  Subsequently, on October 8, 1997, Deputy Sixt sent Mr. Raspberry a further letter notifying him that the urine sample taken on September 23 had tested positive.  He was directed to appear at a hearing which was held at Fire Headquarters on October 15, 1997 before Commissioner Keane.  Exs. 60, 61.

On October 29, 1997, Commissioner Keane issued a Determination finding that the evidence presented at the hearing established a "serious violation of the Drug Testing Policy warrant[ing] the most serious penalty."  Ex. 61, p. 43.  According to the Determination, plaintiff stated at the hearing that he was taking prescription pain medication, along with other over-the-counter pain medications, at the time of the second random drug test, and that he had not been offered the opportunity to discuss the test results with a MRO.  However, D. Michael Rosenberg testified by telephone that, as the MRO for the Union Occupational Health Center, he reviewed the chain of custody of Mr. Raspberry's second test, reviewed the results for accuracy, and contacted Mr. Raspberry on September 29, 1997 to discuss the results.  *Id.*  Dr. Rosenberg testified that neither the

over-the-counter medications nor the prescription medications plaintiff was taking at the time of the test could have caused the positive results. The MRO also testified that he gave Mr. Raspberry an opportunity to have his split sample tested, and that this sample also came back positive. Based on this evidence, Commissioner Keane terminated Mr. Raspberry's employment, effective October 15, 1997. *Id.*, pp. 41-43.

### 13. Terry Scott

Mr. Scott was deposed on September 19, 2005. He testified that he began his career as a firefighter with the Buffalo Fire Department in 1984. He was drug tested by the Fire Department on approximately six occasions. One of these tests, administered in September 1998, came back positive. He attended inpatient treatment at Conifer Park near Albany from October 2 through October 30, 1998. *See* Ex. 62 (Scott Dep.), pp. 7, 11-13.

Upon returning from inpatient treatment, Mr. Scott attended the outpatient treatment program at the Beacon Center in the Ellicott Square Building, where he was regularly tested for drugs. In a progress report dated December 17, 1998, the Beacon Center informed Deputy Sixt that a sample provided by Mr. Scott on December 10, 1998 had tested positive. Ex. 64. By letter dated December 22, 1998, Deputy Sixt notified Mr. Scott that he had been suspended without pay as a result of this violation of the Drug Testing Policy, and that he had the right to request a hearing. Ex. 65.

A series of hearings were subsequently held in January, February, and March 1999. On March 20, Commissioner Keane issued a Determination finding the evidence presented at those hearings sufficient to establish that Mr. Scott tested positive for drugs a second

time following rehabilitation for the first violation, and that he failed to appear for ongoing outpatient treatment, warranting immediate termination of his employment.  Ex. 67.

Mr. Scott filed a petition in state court challenging his termination, which was resolved by a settlement agreement entered into with the City in March 2000, pursuant to which the City agreed to reinstate Mr. Scott to his job upon his successful completion of an outpatient rehabilitation program at Kaleida Health.  *See* Ex. 68.

### 14.    Michael Southern

Mr. Southern was deposed on April 11, 2007.  He testified that he began working for the Buffalo Fire Department in 1983.  In October 1996 he was taken to ECMC for random drug testing, along with other members of his crew.  He was informed that this test had come back positive, and that he should contact the EAP Coordinator at the Fire Department.  He subsequently enrolled in the outpatient treatment program at the Beacon Center, Ellicott Square location, while remaining on active duty.  His treatment consisted of group counseling three times a week and regular drug testing.  Ex. 69 (Southern Dep.), pp. 11, 17- 27.

One of the tests Mr. Southern took at the Beacon Center also came back positive. At the direction of the EAP Coordinator, Mr. Southern thereafter enrolled in the inpatient program at Conifer Park.  After completing the 28-day inpatient treatment program, Mr. Southern returned to outpatient  treatment at the Beacon Center, which he successfully completed in January 1998.  *Id.* at 42-45; *see also* Ex.72, p. 13 .

In August 1998, Mr. Southern once again tested positive in a random urinalysis conducted by the Buffalo Fire Department at ECMC.  By letter dated September 16, 1998,

Deputy Sixt formally notified Mr. Southern of the charges against him, his suspension without pay, and the scheduling of a hearing, which was held before Commissioner Keane on September 28, 1998. *See* Ex. 71. On November 16, 1998, the Commissioner issued his Determination finding the evidence sufficient to establish that Mr. Southern violated the Drug Testing Policy by testing positive a second time following rehabilitation for a previous violation, warranting his immediate discharge from employment. Ex. 72. The Commissioner declined to consider Mr. Southern's defense that the second positive test was the result of accidental ingestion, in the absence of any testimony or documentation to support this defense and "particularly in the case of an individual who has tested positive for use of the same drug in the past." *Id.* at 15.

### 15.   John Tucker

Mr. Tucker was deposed on December 29, 2006. He testified that he joined the Buffalo Fire Department as a firefighter in 1977, and voluntarily retired from the Department in 2001. *See* Ex. 73 (Tucker Dep.), pp. 9, 13.

Mr. Tucker testified that he was randomly tested for drugs at ECMC in 1995, along with other crew members. Soon thereafter he was told by the MRO that the test had come back positive. He was given the opportunity to explain why he tested positive, but he could not offer any explanation. He was instructed to report to Deputy Sixt's office, where he met with Sixt and representatives from the Union. They informed Mr. Tucker that he would be required to attend an outpatient treatment program at the Beacon Center downtown. *See id.* at 27-36.

Mr. Tucker testified that he attended outpatient treatment at the Beacon Center for six to eight weeks.  His treatment included two to three group sessions per week and regular urine testing.  He remained on paid sick leave this entire time, and returned to active duty upon completing his treatment.  *See id.* at 36-38

### 16.   Michael Varner

Mr. Varner was deposed on December 18, 2006.  He began his career as a firefighter with the Buffalo Fire Department in 1987, and was terminated by the Fire Department on January 21, 1997.  He testified that he was tested for drugs under the Department's Drug Testing Policy on several occasions.  The first random test took place at ECMC in 1995.  Two days later, a doctor from ECMC informed Mr. Varner that his sample had tested positive, and instructed him to go see Deputy Sixt immediately.  Mr. Varner met that day with Deputy Sixt at Fire Headquarters and was informed that, as a result of his positive test, he would be required to attend outpatient treatment at the Beacon Center. Given the option of attending either the Sheridan Drive or Ellicott Square locations of the Beacon Center, Varner chose the Sheridan Drive location.  *See* Ex. 74 (Varner Dep.), pp. 11, 17-19,  22-27.

Mr. Varner testified that he attended outpatient treatment for over a year, which consisted of two or three group sessions each week, one individual session each week, and weekly urine screenings.  During this time, one of his weekly urine screenings tested positive.  He was suspended for thirty days, and placed on an intensified treatment program at the Beacon Center.  Upon returning to active duty, Mr. Varner continued to attend outpatient treatment with drug testing on a weekly basis.  Mr. Varner tested positive

at the Beacon Center again in January 1996, while he was on IOD status for injuries suffered fighting a fire.  He was suspended without pay for sixty days, and thereafter returned to active duty while continuing outpatient treatment.  *Id.* at 27-38, 41.

On May 29, 1996, Mr. Varner submitted to random testing at ECMC under the Department's Drug Testing Policy.  He was informed by the doctor that the test had come back positive.  Mr. Varner testified that he asked the doctor how this was possible, since he had tested negative at the Beacon Center both the day before and the day after the positive test at ECMC.  According to Mr. Varner, the doctor told him that perhaps the testing at ECMC was more comprehensive than the Beacon Center's testing, and that he should take it up with the Deputy Commissioner.  As a result, on June 6, 1996, Mr. Varner was suspended pending a disciplinary hearing. *Id.* at 43-47; *see also* Ex. 76, p. 6.

The hearing took place on January 21, 1997, before Commissioner Keane.  On February 6, 1997, the Commissioner issued a Determination finding the evidence presented at the hearing sufficient to establish that Mr. Varner had tested positive twice under the Fire Department's random drug testing program; tested positive on more than one occasion during treatment; and failed to comply with treatment.  The Determination further states that at his hearing, Mr. Varner admitted that he continued to use illegal drugs, despite treatment.  As a result, Mr. Varner was discharged from employment with the Fire Department effective January 21, 1997.  *See* Ex. 76, pp. 5-7.

### 17.    Cranston L. Wilson

Mr. Wilson was deposed on January 24, 2007.  He testified that he joined the Buffalo Fire Department as a firefighter in 1997.  At the time of his deposition he was on IOD status, assigned to Engine 23.  *See* Ex. 77 (Wilson Dep.), pp. 9-10, 14-15.

Mr. Wilson testified that he was tested for drugs several times under the Fire Department's Drug Testing Policy, and on two occasions the tests were positive.  The first positive test occurred in 1997, as the result of random testing at ECMC.  It was subsequently determined that the positive result–for morphine–was traceable to lemon-flavored poppyseed muffins.  *See* Ex. 77 (Wilson Dep.), pp. 18-23, 28-30.

Mr. Wilson was randomly tested for drugs at ECMC again in 1998.  This test came back positive for marijuana.  He testified that, during a meeting with the MRO to discuss the test results, the MRO asked him if there was any reason why his test may have come back positive.  Mr. Wilson told the MRO that he had been on vacation and "might have smoked a joint."  *Id.* at 37.  After meeting with the MRO, Mr. Wilson met with Deputy Sixt, the MRO, and Union representatives.  Deputy Sixt told Mr. Wilson to enroll in outpatient treatment at the Beacon Center's Ellicott Square location.  *See id.* at 37- 40.

Mr. Wilson testified that he attended outpatient treatment at the Beacon Center three times a week from September through December 1998, while remaining on active duty.  His treatment consisted of therapy sessions and regular drug testing.  On December 10, 1998, he submitted a urine sample at the Beacon Center, which tested positive for drugs.  Subsequent correspondence from the Beacon Center to the Commissioner indicated that Mr. Wilson had failed to attend several scheduled treatment sessions in

January 1999, and had failed to submit to drug testing on more than one occasion. *See* Ex. 80. Consequently, on February 22, 1999, Deputy Lydon sent Mr. Wilson a letter directing him to appear at a hearing to answer charges of violating the Drug Testing Policy. *See* Ex. 79.

The hearing was held on March 8, 1999, before Commissioner Keane. Mr. Wilson appeared with counsel and Union representation. On March 15, 1999, the Commissioner issued a Determination finding that the evidence established the violations charged, warranting Mr. Wilson's immediate discharge form employment with the Fire Department. *See* Ex. 81. Mr. Wilson filed a grievance to challenge his termination, which was ultimately withdrawn in consideration of a settlement agreement entered with the City in March 2000, reinstating him to active duty as a firefighter. *See* Ex. 82; *see also* Ex.77, pp. 81-82.

Discovery on the claims alleged in Complaint "A" concluded with the deposition of Deputy Sixt in January 2011 (*see* Ex. 3), and the deposition of Mr. Donnelly in June 2001 (*see* Ex. 4). On August 19, 2011, the City and the Union filed separate motions for summary judgment seeking dismissal of Third Amended Complaint "A" in its entirety. The parties have submitted legal memoranda, affidavits, declarations, documentation, and exhibits, and have otherwise had full opportunity to present all materials pertinent to the issues raised by these motions, which are addressed in turn below.

## DISCUSSION

### I.    Summary Judgment

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged.  *See, e.g., Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 311 n. 7 (S.D.N.Y. 2011); Fed. R. Civ. P. 56, Committee's notes to 2010 amendments.   Under those standards, the moving party bears the initial burden of establishing that no genuine issue of material fact exists.  *Rockland Exposition, Inc. v. Great American Assur. Co.*, 746 F. Supp. 2d 528, 532 (S.D.N.Y. 2010), *aff'd*, 445 F. App'x 387 (2d Cir. 2011).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law …." *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed …." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks and citation omitted), *quoted in Kaminski v.*

*Anderson*, 792 F. Supp. 2d 657, 662 (W.D.N.Y. 2011).   In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted).

The Second Circuit has also held that, when deciding whether summary judgment should be granted in an employment discrimination case, the court "must take additional considerations into account."  *Desir v. City of New York*, 2011 WL 5176178, at *1 (2d Cir. Nov. 2, 2011) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  As stated in *Gallo*:

> A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue.  Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

*Gallo*, 22 F.3d at 1224.   Nonetheless, summary judgment remains appropriate in discrimination cases, as "the salutary purposes of summary judgment–avoiding protracted, expensive and harassing trials–apply no less to discrimination cases than to … other areas of litigation."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), *cert. denied*, 534 U.S. 993 (2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.

2000) (affirming grant of summary judgment in favor of employer based on plaintiff's failure to produce evidence of pretext), *cert. denied*, 540 U.S. 811 (2003).

## II.      City Defendants' Motion

The City of Buffalo and individual defendants Keane and Sixt move for summary judgment dismissing each of the nine causes of action set forth in Third Amended Complaint "A" based on the following grounds:

A.      Plaintiffs' facial challenge to the Drug Testing Policy, alleged in the First Cause of Action, was rejected by this court in a prior ruling.

B.      Plaintiffs' due process challenge to the Drug Testing Policy, alleged in the Second Cause of Action, fails under either a "procedural due process" or "substantive due process" analysis.

C.      The Third Cause of Action alleging violation of the plaintiffs' right to privacy fails as a matter of law.

D.      Plaintiffs' equal protection claim, alleged in the Fourth Cause of Action, must be dismissed in the absence of any evidence demonstrating that White firefighters were treated differently under the Drug Testing Policy.

E.      Plaintiffs' claims under 42 U.S.C. §§ 1981and 1983, alleged in the Fifth Cause of Action, are legally deficient.

F.      Plaintiffs' Title VII and NYHRL claims, alleged in the Sixth and Eight Causes of Action respectively, are legally deficient.

G.      Plaintiffs' conspiracy claim under 42 U.S.C. § 1985, alleged in the Seventh Cause of Action, was dismissed by this court in a prior ruling.

H.      Plaintiffs' NYHRL "aiders and abettors" claim, alleged in the Ninth Case of

Action, is legally deficient.

Each of these grounds is now addressed in turn.

## A.      First Cause of Action:  Facial Challenge to the Drug Testing Policy

As discussed above, on March 16, 2002, this court issued an order granting in part

and denying in part a previous motion by the City seeking dismissal of Second Amended

Complaint "A."   In that motion, the City had argued that plaintiffs lacked standing to

challenge the constitutionality of the Drug Testing Policy because it was negotiated and

agreed to as the result of collective bargaining between the City and the Union, relying on

the holdings in *Dykes v. Southeastern Pennsylvania Transp. Auth.*, 68 F.3d 1564 (3d Cir.

1995), *cert. denied*, 517 U.S. 1142 (1996), and *Ware v. City of Buffalo*, 186 F. Supp. 2d

324 (W.D.N.Y. 2001).   This court declined the invitation to rule on this aspect of the

standing issue, finding instead that:

> [N]either *Dykes* nor *Ware* is on point with this case.  Both of those cases
> involved facial challenges to the respective drug-testing program at issue.
> Plaintiffs here do not challenge the constitutionality of the Fire Department's
> drug-testing policy on its face.  Rather, plaintiffs challenge what they believe
> to be the City's discriminatory enforcement of a race-neutral drug-testing
> policy.   As such, this case involves an "as applied" challenge to the
> drug-testing program, and the holdings in *Dykes* and *Ware* present no
> obstacle to plaintiffs.

*M.O.C.H.A.*, 199 F. Supp. 2d at 50.

This finding, reached upon thorough consideration of the allegations in the First

Cause of Action of Second Amended Complaint "A" in the light most favorable to plaintiffs,

applies with equal force to the identical allegations in the First Cause of Action of Third

-33-

Amended Complaint "A."  Plaintiffs have conceded as much in their response to the City's present summary judgment motion.  *See* Item 488, p. 4 n.1 ("Plaintiffs have acknowledged that this Court has previously held that facial challenges to the City's drug testing policy cannot be made under the 14th Amendment.") (citing *Ware* and *M.O.C.H.A.*).

Accordingly, no reasonable jury could find in favor of plaintiffs on their claim that the Drug Testing Policy is unconstitutional on its face, and the City defendants are entitled to summary judgment as a matter of law dismissing the First Cause of Action of Third Amended Complaint "A."

### B.    Second Cause of Action: Due Process

In their Second Cause of Action, plaintiffs allege that the Drug Testing Policy, as applied, violated the plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.  Broadly construed, this claim invokes both the substantive and procedural components of the Due Process Clause.  *Cf. Zinernon v. Burch*, 494 U.S. 113, 125 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them …," while the procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property … without due process of law."  *Id.* (internal quotations marks and citations omitted).

### 1.    Procedural Due Process

Summary judgment analysis of a procedural due process claim ordinarily proceeds in two steps.  First, the court must determine "whether there exists a … property interest

of which a person has been deprived." *Swarthout v. Cooke*, ___U.S.___, 131 S.Ct. 859, 861 (2011), *quoted in Oneida Indian Nation of New York v. Madison County*, 665 F.3d 408, 428 (2d Cir. 2011). If so, then the court must determine "what process plaintiffs were due before they could be deprived of that interest." *Sealed v. Sealed*, 332 F.3d 51, 55 (2d Cir. 2003), *quoted in Adams v. Suozzi*, 517 F.3d 124, 127 (2d Cir. 2008).

The City contends that two plaintiffs–Michael Brown and John Tucker–have not been deprived of a cognizable property interest because neither of these employees was terminated from employment or suspended without pay as a consequence of their positive drug test results.[2] The City again relies on *Ware*, in which this court analyzed a substantially identical due process challenge to the Buffalo Fire Department's Drug Testing Policy. In *Ware*, the plaintiff was placed on suspension after testing positive for drugs. The Deputy Commissioner (Sixt) told Ware to use his sick time and vacation time during the suspension, and directed him to enter and successfully complete the treatment program at the Beacon Center. He was subsequently suspended without pay on two occasions for unexcused absences from the treatment program, but those suspensions were later rescinded. After thorough review of pertinent Supreme Court and Second Circuit authority, this court held that the discipline imposed for Ware's violations of the Drug Testing Policy did not implicate a protected property interest:

> Given that the plaintiff does not contend he lost remuneration because of the suspension (other than vacation time benefits), even if his suspension constituted a property interest, it would be significantly less compelling than

---

[2] The City also submits that plaintiff Walter Jones, Jr., suffered no deprivation of a cognizable property interest because he was neither terminated nor suspended without pay. However, the court's review of the record submitted on summary judgment indicates that Mr. Jones was indeed suspended without pay for least thirty days. *See* Exs. 41, 42.

> that of an individual who has been denied the very means by which to live. His status was not significantly altered. He was suspended briefly, and his full-time employment was not terminated. Not every grievous loss visited upon a person by the state is sufficient to invoke the procedural protections of the due process clause …. Consequently, the court holds that plaintiff has failed to state a claim under the Due Process Clause and section 1983 ….

*Ware*, 186 F. Supp. 2d at 334 (internal quotation marks and citations omitted).

A similar result is warranted here with respect to the due process claims of Michael Brown and John Tucker. Both of these plaintiffs testified at their depositions that the only consequence of having tested positive for drugs was that they were each required to attend an outpatient treatment program, and each was placed on sick leave status at full pay for the entire duration of the program. Neither one was discharged from employment, suspended without pay, or otherwise required to lose any remuneration as a result of their conduct. Under *Ware* and the cases examined therein, the deprivations suffered by plaintiffs Brown and Tucker as a result of the City's application of the Drug Testing Policy must therefore be deemed insufficient to invoke the procedural protections of the due process clause.

In the absence of a constitutionally protected property interest in not being suspended without loss of remuneration, no reasonable jury could find in favor of these individual plaintiffs on their claims that the Fire Department's Drug Testing Policy, as applied to them, violated the procedural component of the Fourteenth Amendment's Due Process Clause. Accordingly, the City defendants are entitled to summary judgment as a matter of law dismissing the claims of Michael Brown and John Tucker as alleged under the Second Cause of Action of Third Amended Complaint "A."

Even assuming plaintiffs Brown and Tucker possessed a cognizable property interest of which they were deprived, the court's consideration of the record on summary judgment establishes that, as a matter of law, each of the individual plaintiffs received all the process they were due prior to the imposition of any discipline for violating the Drug Testing Policy.   In this regard, at the second step of the procedural due process analysis the court "asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Narumanchi v. Board of Trustees of Ct. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988).   Notably, the Second Circuit has recently reiterated the requirements of procedural due process in the context of disciplinary action against a public employee based on positive random drug test results, as follows: (1) oral or written notice of the charges against the employee; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to present his or her side of the story.  *Zynger v. Dep't of Homeland Sec.*, 370 F.App'x 253, 255 (2d.Cir. 2010) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)).   In *Zynger*, the circuit court found the undisputed evidence in the record on summary judgment sufficient to establish that the plaintiff knew she was being disciplined based on positive random drug test results, and that she had ample opportunity to explain her side of the story during meetings with a medical review officer and her supervisor.   Upon balancing the plaintiff's interest in her continued public employment against the government's interest in the effective promotion of national security through the Department of Homeland Security, the court found the pre-termination provision of notice

and opportunity to be heard constitutionally adequate. *Zynger*, 370 F.App'x at 255-56

(citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)).

Similarly, in this case the record on summary judgment reveals that each of the

seventeen plaintiffs were provided with ample notice of the positive results of random drug

testing as well as the likely consequences of those results, and had a full opportunity to

explain the results to the MRO and the Commissioner prior to any disciplinary action. The

Drug Testing Policy specifically provides that, before discipline can be imposed on an

employee for violating the Policy:

> [T]he Commissioner of Fire or his designee shall conduct [a] hearing and
> afford the employee the opportunity to offer [an] explanation in mitigation of
> the proposed discipline. The Commissioner's determination may be
> appealed by the employee, at his expense, consistent with his rights under
> statute.

Item 469, Ex. 5, p. 8. As revealed by the court's review of the deposition testimony,

summarized at some length above, it is undisputed that every one of the plaintiffs named

in Third Amended Complaint "A" was provided an opportunity to be heard prior to the

imposition of disciplinary action by the City.

In addition to the Drug Testing Policy's pre-termination notice and hearing

procedures, the CBA between the City and the Union "contains an elaborate series of

procedures for a disciplined or discharged employee to follow, which includes written

service and answer to charges, informal hearing, formal hearing, and appeal to either the

Buffalo Municipal Civil Service Commission or the New York State Supreme Court via an

Article 78 proceeding." *Ware*, 186 F. Supp. 2d at 329; *see also* CBA Art. XXIV, "Discipline

and Discharge" (Ex. 6, pp. 10-14). Several of the plaintiffs successfully utilized these post-

termination procedures, demonstrating their adequacy and effectiveness. As stated by the

Second Circuit, "there is no due process violation where, as here, pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams*, 517 F.3d at 127.

Finally, "it is well established that 'an Article 78 proceeding is a perfectly adequate post-deprivation remedy' in the context of employment termination." *MacShane v. City of New York*, 2007 WL 1062936, at *7 (E.D.N.Y. Mar. 30, 2007) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996), *cert. dismissed*, 521 U.S. 1140 (1997)). It is beyond dispute that all of the plaintiffs could have challenged their employment status in a state court Article 78 proceeding.

Upon considering the common interest of these individual employees in the continuation of their public employment; the diminished risk of erroneous deprivation of this interest through the pre- and post-termination procedures outlined above; and the City's substantial interest in maintaining an effective firefighting unit, *see Matthews*, 424 U.S. at 335; *Zynger*, 370 F. App'x at 255-56, the court finds that each of the plaintiffs received all the process they were due prior to the Fire Department's imposition of discipline for violations of the Drug Testing Policy. Accordingly, no reasonable jury could find in favor of plaintiffs on the procedural component of the due process claim alleged in the Second Cause of Action of Third Amended Complaint "A."

## 2.  Substantive Due Process

To establish a violation of substantive due process, plaintiff must demonstrate that the action taken by the City was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847

n.8 (1998), *quoted in Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005).  To shock the conscience, official conduct must be so " 'brutal and offensive that it [does] not comport with traditional ideas of fair play and decency.' "  *Robles v. Dennison*, 449 F.App'x 51, 55 (2d Cir. 2011) (quoting *Lewis*, 523 U.S. at 847).

As indicated by the discussion above, it is undisputed that each plaintiff was afforded notice and opportunity to be heard in accordance with the pre-termination procedures outlined in the Drug Testing Policy, and each disciplined employee had full opportunity to employ the post-termination procedures provided under the CBA and N.Y.C.P.L.R. Article 78.  Under these circumstances, "no reasonable jury could identify gross abuse of governmental authority, much less conduct that shocks the contemporary conscience."  *Zynger*, 370 F.App'x at 256.

Based on this analysis, plaintiffs have failed to establish that the City's enforcement of the Drug Testing Policy resulted in any violation of either the procedural or substantive component of the Due Process Clause of the Fourteenth Amendment.  Accordingly, the City defendants are entitled to summary judgment as a matter of law dismissing the Second Cause of Action of Third Amended Complaint "A."

## C.    Third Cause of Action: Right to Privacy

In the Third Cause of Action, plaintiffs allege that the Drug Testing Policy on its face violates their privacy rights under the Due Process Clause of the Fourteenth Amendment. The City once again relies on *Ware*, which rejected an identical claim for the reason that "[t]he Fourteenth Amendment Due Process Clause does not protect privacy interests." *Ware*, 186 F. Supp. 2d at 338.

More recently, in *Nat'l Aeronautics and Space Admin. v. Nelson*, ___U.S.___, 131 S.Ct. 746 (2011), the Supreme Court revisited the question whether a federal constitutional right to informational privacy exists, in the context of a suit brought by NASA contract employees challenging an employment questionnaire which sought background information about prior illegal drug use and rehabilitation.  The employees claimed that this type of inquiry violated their constitutionally protected right to priviacy, referred to broadly by the Supreme Court in two 1977 cases as "a  constitutional privacy 'interest in avoiding disclosure of personal matters.' " *Nelson*, 131 S.Ct. at 751 (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); citing *Nixon v. Admin'r of Gen. Services*, 433 U.S. 425, 457 (1977)).  The Court in *Nelson* acknowledged that a few decisions since 1977 had "mentioned the concept in passing and in other contexts, … [b]ut no other decision has squarely addressed a constitutional right to informational privacy." *Id.* at 756.  Assuming, but not deciding, that the government's inquiries about employees' prior illegal drug use "implicate[d] a privacy interest of constitutional significance … ," the Court held that:

> The Government has good reason  to ask employees about their recent illegal-drug use.  Like any employer, the Government is entitled to have its projects staffed by reliable, law-abiding persons who will efficiently and effectively discharge their duties.  Questions about illegal-drug use are a useful way of figuring out which persons have these characteristics.

*Id.* at 759-60 (internal quotation marks and citations omitted).  Significantly, the Court recognized that the government is entitled to " 'wide latitude' " when acting not as regulator, but as the manager of its internal affairs, particularly "in its dealings with employees." *Id.* at 760-61 (quoting *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 600 (2008); *see also Connick v. Myers*, 461 U.S. 138, 147 (1983) ("[A]bsent the most unusual

circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

The federal courts have also explicitly recognized that, as an employer of firefighters, the government's compelling interest in public safety outweighs any constitutionally protected privacy interests implicated by random drug testing. *See Hatley v. Dep't of the Navy*, 164 F.3d 602, 603-04 (Fed. Cir. 1998). *Hatley* involved a claim by a firefighter employed by the U.S. Navy that the Navy's random drug testing program violated his Fourth Amendment right to be free from unreasonable search and seizure. The Federal Circuit rejected this claim, reasoning that:

> Petitioner was a firefighter. The safety of others was in his hands, and an impairment due to drug use could well have led to otherwise avoidable injury or death. It is generally established that employees responsible for the safety of others may be subjected to drug testing, even in the absence of suspicion of wrongdoing.
> …
> We conclude that the government's compelling interest in keeping its firefighters free of drugs outweighs the expectation of privacy of these employees.

*Hatley*, 164 F. 3d at 604.

This reasoning is no less persuasive here, where the privacy challenge is based on the Fourteenth Amendment's protection against deprivation of property without due process. The City's compelling interest in a drug-free Fire Department is clearly set forth at the outset of the Drug Testing Policy's general statement of purpose: "employee drug abuse results in lost productivity, increased absenteeism, and a danger to the safety of fellow workers and to the public." Item 469, Ex. 5, p. 1. Therefore, even assuming the existence of a constitutionally protected privacy interest in avoiding disclosure of positive

drug test results, the weight of authority instructs that any such interest is decidedly outweighed by the City's clearly stated, compelling public interest in maintaining a drug-free Fire Department.

Accordingly, no reasonable jury could find in favor of plaintiffs on their claim that the Drug Testing Policy on its face violates their privacy rights, and the City defendants are entitled to summary judgment as a matter of law dismissing the Third Cause of Action of Third Amended Complaint "A."

### D.   Fourth Cause of Action: Equal Protection

In the Fourth Cause of Action, plaintiffs allege that the Drug Testing Policy as applied  violates the Fourteenth Amendment's Equal Protection Clause.  To prevail on an equal  protection claim, a plaintiff must show that (1) he was treated differently from other similarly-situated individuals, and (2) the differential treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (internal quotation marks and citations omitted).  "To be similarly situated, the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Giacco v. City of New York*, 502 F. Supp. 2d 380, 387-88 (S.D.N.Y. 2007) (granting summary judgment for defendant dismissing equal protection claim because plaintiff "fail[ed to identify any person to whom he was similarly situated, let alone a similarly situated person who received better treatment."), *aff'd*, 308 F. App'x 470 (2d Cir. 2009); *see also Ferguson v. City of Rochester School Dist.*, 485 F. Supp. 2d 256, 260-61 (W.D.N.Y. 2007) (granting

-43-

summary judgment for defendant because no reasonable jury could find that plaintiffs had identified a similarly situated individual who was treated differently).

In addition, "[p]roof of racially discriminatory intent  or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Hayden v. Paterson*, 594 F.3d 150, 162 (2d Cir. 2010). "To prevail, plaintiffs must prove that the disparate treatment was *caused by* the impermissible motivation.  They cannot merely rest on a showing of disparate treatment." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005).  In other words, to survive summary judgment, plaintiffs must come forward with evidence "that white employees were treated in any manner differently than black employees."  *Laverpool v. New York City Transit Authority*, 835 F. Supp. 1440, 1459 (E.D.N.Y. 1993), *aff'd*, 41 F.3d 1501 (2d Cir. 1994).

Despite more than ample opportunity to do so during the interminably long course of this litigation, plaintiffs have failed to submit any admissible evidence to support their allegations that similarly situated White firefighters were treated differently or disciplined more leniently under the Drug Testing Policy, or even to identify any such firefighters.  By way of example, some of the plaintiffs claimed that White firefighters received more favorable treatment following positive drug test results because they were allowed to attend the Beacon Center program at the Sheridan Drive location, rather than at the Ellicott Square Building location.  However, there is nothing in the record to support a reasonable jury's finding that the treatment provided at Sheridan Drive was somehow measurably better or more lenient than the treatment provided at Ellicott Square, or that such differential treatment might rise to the level of an adverse employment action or Equal

Protection Clause violation.   In any event, at least three plaintiffs testified that they attended the outpatient treatment program at the Sheridan Drive location.   *See* Ex. 7 (Varner), p. 27; Ex. 37 (W. Jones), p. 34 Ex. 51 (Louie), p. 23.

Likewise, plaintiffs have failed to present any evidence to support their specific claims of disparate treatment, *e.g.*, that White firefighters were afforded repeated opportunities to continue drug treatment after testing positive while attending the program; that White firefighters who tested positive were not suspended pending their disciplinary hearings; that White firefighters were allowed to refuse random drug testing while on IOD status, hospitalized, laid off, on vacation, or otherwise absent; and that White firefighters received more lenient discipline or underwent more lenient drug treatment in any respect. Rather, plaintiffs rely on sheer numbers to argue that, although African American firefighters represent only 25-33% of the employees who tested positive, they account for more than 90% of the terminations imposed for violating the Policy.[3]   *See* Item 488, pp. 1-2; 9.  However, as stated by the Second Circuit in *Hayden*:

> Although disproportionate impact is not irrelevant, to violate the Fourteenth Amendment the disproportionate impact must be traced to a purpose to discriminate on the basis of race.  Discriminatory purpose implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmakers … selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.

*Hayden*, 594 F.3d at 162-62 (internal quotation marks, alterations and citations omitted).

---

[3]The available statistics in the record on summary judgment indicate that, of the 19 firefighters terminated from employment as the result of positive drug test results, 15 (79%) were identified as "Black Male" and 4 (21%) were identified as "White Male."  Item 496-1, p. 6.

Importantly, even if plaintiffs could identify any similarly situated White firefighters who were accorded more favorable treatment than African American firefighters with respect to the imposition of discipline for violating the Drug Testing Policy, no evidence has been presented upon which a reasonable jury could conclude that the Fire Department and the Union adopted or reaffirmed the Policy "because of, not merely in spite of," its adverse effects upon African American firefighters, or that the more favorable treatment was based upon an intent to discriminate.  *See, e.g., Harmon v. Bratton*, 1995 WL 405015, at *5 (E.D.N.Y. June 29, 1995) ("Intent is an essential element of an equal protection claim, and plaintiff cannot prevail by showing only that the Department's drug testing policy has a disparate impact on African American officers."), *aff'd*, 164 F.3d 618 (2d Cir. 1998) (affirming defendant's renewed motion for summary judgment on plaintiff's equal protection claim).  In the absence of such a showing, no reasonable jury could find in favor of plaintiffs on their claim that the Policy as applied violated the Equal Protection Clause of the Fourteenth Amendment.

Accordingly, the City defendants are entitled to summary judgment as a matter of law dismissing the Fourth Cause of Action of Third Amended Complaint "A."

### E.    Fifth Cause of Action:  Sections 1981and 1983

In the Fifth Cause of Action, plaintiffs claims that defendants violated 42 U.S.C. §§ 1981 and 1983.  With regard to plaintiffs' Section 1981 claim, this court remains bound by the Supreme Court's holding in *Jett v. Dallas Independent School District*, 491 U.S. 701, 733 (1989), that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state

governmental units ….”  *See Richardson v. City of Niagara Falls, New York*, 2012 WL 75771, at *5 & n. 3 (W.D.N.Y. Jan. 10, 2012); *Coates v. City of Niagara Falls, New York*, 2012 WL 75772, at *5 & n. 3 (W.D.N.Y. Jan. 10, 2012).

With regard to plaintiffs’ Section 1983 claim, that section only “serves as the basic vehicle for federal court review of alleged and state and local violations of federal law.” *Ware*, 186 F. Supp. 2d at 331.  Section 1983 “is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.”  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Jones v. J.C. Penney's Dept. Stores, Inc.*, 2007 WL 1577758, at *5 (W.D.N.Y. May 31, 2007), *aff'd*, 317 F. App'x 71 (2d Cir. 2009).  Plaintiffs’ Section 1983 claim in this action is necessarily premised on the constitutional due process, informational privacy and equal protection claims asserted in the first four Causes of Action–all of which are subject to dismissal for the reasons stated above.

Accordingly, because plaintiffs cannot establish an essential element of their Section 1983 claim–*i.e.*, that the conduct complained of deprived plaintiffs of “any rights, privileges, or immunities secured by the Constitution and laws” of the United States,  42 U.S.C. § 1983; *see Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994); *Kasiem v. Guzman*, 2011 WL 4352387, at *3 (W.D.N.Y. Sept. 16, 2011), the City defendants are entitled to summary judgment dismissing that claim as a matter of law.

To the extent plaintiffs seek to impose liability under Sections 1981 and 1983 against defendants Sixt and Keane in their individual capacities, those defendants are protected from liability under the doctrine of qualified immunity.  “Government officials

performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotations omitted).

There is no question that, in carrying out the administrative and disciplinary functions involved in enforcing the Fire Department's Drug Testing Policy, defendants Sixt and Keane were performing discretionary governmental functions.   And, as amply demonstrated by the discussion above, their official conduct in requesting firefighters to submit to random drug testing and imposing discipline for violations of the Policy did not violate any clearly established statutory or constitutional rights of which reasonable persons would have known.   Accordingly, based on the record presented, the court finds that the conduct complained of on the part of individual defendants Sixt and Keane "was not objectively unreasonable …," *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998), and that those defendants are entitled to immunity from this suit for damages under Sections 1981 and 1983. *See Knighton v. City of Syracuse Fire Department*, 145 F. Supp. 2d 217, 222 n. 7 (N.D.N.Y. 2001) (finding Fire Chief immune from suit where it was "objectively reasonable" for him "to request the drug testing and to eventually terminate Plaintiff.").

For these reasons, the City defendants are entitled to summary judgment as a matter of law dismissing the Fifth Cause of Action of Third Amended Complaint "A."

**F.     Sixth and Eighth Causes of Action: Title VII and NYSHRL**

In the Sixth Cause of Action, plaintiffs claim that the City defendants' conduct resulted in intentional discrimination in employment on the basis of race, in violation of Title VII.  In the Eighth Cause of Action, plaintiffs claim that defendants' conduct violated Section 296 of the New York State Human Rights Law ("NYSHRL").  Because the analysis of claims brought under the NYSHRL parallels the analysis of Title VII claims, the court considers these claims "in tandem."  *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n. 1 (2d Cir. 1999); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (citing cases), *cert. denied*, 540 U.S. 811 (2003).

Title VII makes it unlawful "for an employer … to fail to hire or to discharge any individual, or otherwise to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Claims brought under this provision are ordinarily analyzed using the familiar burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  *See, e.g., Weinstock*, 224 F. 3d at 42; *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Phillips v. Marriott Int'l, Inc.*, 2010 WL 1269772, at *4 (E.D.N.Y. Mar. 30, 2010).  Under this framework, plaintiffs must first establish a *prima facie* case of discrimination by demonstrating that: (1) they are members of a protected class; (2) they were qualified for the position; (3) they suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *See Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003); *Collins v. N.Y. City Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).  As the Supreme Court

has explained, the plaintiffs' *prima facie* burden "is not onerous.  The plaintiff must prove

by a preponderance of the evidence that [ ]he applied for an available position for which

[ ]he was qualified, but was rejected under circumstances which give rise to an inference

of unlawful discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

(1981); *see also Weinstock*, 224 F.3d at 42 (plaintiff's burden of proof at *prima facie* stage

is "*de minimis*").

Once the plaintiff has established a *prima facie* case of discrimination, the burden

shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the

employment action. *McDonnell Douglas*, 411 U.S. at 802.  In other words, "[t]he defendant

must clearly set forth, through the introduction of admissible evidence, reasons for its

actions which, if believed by the trier of fact, would support a finding that unlawful

discrimination was not the cause of the employment action."  *St. Mary's Honor Ctr. v.

Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks omitted).

Upon the defendant's proffer of a legitimate non-discriminatory reason for its

employment action, "the presumption of discrimination arising with the *prima facie* case

drops from the picture … [and] the plaintiff must then establish that the defendant's

proffered reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42

(citing *St. Mary's Honor Ctr.*, 509 U.S. at 510–11); *see also Fisher v. Vassar Coll.*, 114 F.3d

1332, 1336 (2d Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998).  To demonstrate pretext:

> The plaintiff must produce not simply some evidence, but sufficient evidence
> to support a rational finding that the legitimate, non-discriminatory reasons
> proffered by the defendant were false, and that more likely than not
> discrimination was the real reason for the employment action.  In short, the
> question becomes whether the evidence, taken as a whole, supports a
> sufficient rational inference of discrimination.  To get to the jury, it is not

> enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

*Weinstock*, 224 F.3d at 42 (internal quotation marks, citations, and alterations omitted).

In this case, even if the evidence in the record could be considered sufficient for *prima facie* Title VII purposes to show that any of the plaintiffs were treated less favorably than similarly situated White employees, or that the disciplinary actions taken by defendants otherwise occurred under circumstances giving rise to an inference of discrimination, it is well settled that an employer's decision to deny employment or discipline employees based on positive drug test results constitutes a non-discriminatory business reason for the adverse employment action sufficient to meet the employer's burden at the second step of the *McDonnell Douglas* analysis.  *See, e.g., Davis v. City of New York*, 2003 WL 22832165, at *3 (S.D.N.Y. Nov. 25, 2003) (positive drug test provided non-discriminatory business reason for NYPD's refusal to hire plaintiff) (citing cases); *Knighton*, 145 F. Supp. 2d at 224 ("Defendants correctly assert that the two positive drug tests provided a legitimate, nondiscriminatory reason for terminating Plaintiff."); *Laverpool*, 835 F. Supp. at 1464 (finding that testing positive for cocaine "would appear to be one of the most demonstrative, objective, nondiscriminatory reasons for discharging an employee."); *Matter of Bruno (Sweeney)*, 653 N.Y.S.2d 728, 729 (App. Div. 3d Dep't 1997) ("An employee's use of cocaine represents a willful disregard of the standards of conduct an employer has the right to expect ….").  As the discussion above adequately demonstrates, it is beyond dispute that each instance of employee discipline challenged by this lawsuit followed a clinically-determined positive drug test, clearly establishing a legitimate, nondiscriminatory business reason for the employment action taken by the City.

Accordingly, to avoid summary dismissal of their Title VII and NYSDHR claims, plaintiffs must come forward with sufficient evidence to support a rational finding that race-based discrimination–not repeated positive drug test results, failure to complete rehabilitation, or other cited violations of the Drug Testing Policy–more likely than not was the real reason for the employment actions taken against them.

Plaintiffs contend that there is sufficient evidence in the record to support a rational inference of discrimination, alluding to the City's "fail[ure] to follow its own guidelines to the detriment of Plaintiffs." Item 488, p. 18. For instance, in ruling on plaintiff Edward Josey's grievance, the arbitrator made the specific finding that the City violated its own Drug Testing Policy (and the CBA) by discharging Mr. Josey for failing to successfully complete rehabilitation at the Beacon Center despite clear evidence that he was medically unfit to participate in the program (*see* Item 469, Ex. 50).[4] However, the court's review of the record as a whole, including the circumstances of the grievance which resulted in the arbitrator's determination, reveals nothing that could reasonably be construed as support for the inference that the employment action taken by the City with respect to Mr. Josey was somehow based on racial animus.

In the absence of any such evidence, there is no basis for a rational jury to find that the disciplinary action taken by the City defendants against Mr. Josey, or against any of his

---

[4]The court notes here the City defendants' contention that Mr. Josey's individual claim in this action is barred by the terms of a general release contained in a settlement agreement dated May 9, 2008, entered in a separate lawsuit in this court, *Josey v. City of Buffalo*, Civil No. 05-cv-0352A (W.D.N.Y.) (*see* Item 467-2, § 4(A)). Because the matters ruled upon herein are intended to fully address all remaining claims as between all parties (including Mr. Josey), and notwithstanding well-settled Second Circuit case law recognizing the validity and enforceability of such general releases, *see, e.g., Mazurkiewicz v. New York City Health & Hosp. Corp.*, 356 F. App'x 521, 523 (2d Cir. 2009) (affirming judgment on the pleadings for employer based on plaintiff's release of all claims arising out of plaintiff's termination); *Malaney v. El Al Israel Airlines*, 331 F. App'x 772, 775 (2d Cir. 2009), the court declines to address this contention.

fellow African American firefighters, was not based on the objective, nondiscriminatory, and legitimate business reason of unsuccessful rehabilitation after testing positive for drugs, but was instead based on race.  As the Second Circuit has explained:

> [O]nce the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency; … the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove–particularly discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

Based on the entire record presented on summary judgment, including the arbitrator's determination in the matter of Mr. Josey's grievance, the court finds that no rational jury could conclude that the City's articulated reasons for the disciplinary taken with respect to each of the seventeen plaintiffs were false, and that more likely than not discrimination was the real reason.  Simply stated, after more than fourteen years of litigation, plaintiffs have been unable to come forward with any evidence upon which a reasonable inference of race-based discrimination could be drawn.  Rather, "[p]laintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race.  This is not sufficient."  *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001).

Accordingly, the City defendants are entitled to summary judgment as a matter of law dismissing the Sixth and Eighth Causes of Action of Third Amended Complaint "A."

### G.     Seventh Cause of Action: Conspiracy

In the Seventh Cause of Action of Third Amended Complaint "A," plaintiffs allege that defendants conspired to discriminate against African American firefighters on the basis

of race "in the implementation, application and enforcement of the Drug Testing Policy,"

in violation of 42 U.S.C. § 1985.  Item 247, §§ 81, 95.  The allegations supporting this claim

are identical allegations supporting the conspiracy claim set forth in the Seventh Cause of

Action of Second Amended Complaint "A" (*see* Item 55, §§ 80, 94), which this court

previously found to be insufficient to satisfy the pleading requirements of Section 1985.

*M.O.C.H.A.*, 199 F. Supp. 2d at 51-52.  Plaintiffs have come forward with no additional

evidence or argument to sustain a different ruling with respect to the conspiracy claim

alleged in the Third Amended Complaint.

　　　　Accordingly, defendants are entitled to summary judgment as a matter of law

dismissing the Seventh Cause of Action of Third Amended Complaint "A."

### H.　　　Ninth Cause of Action:  N. Y. Human Rights Law § 296(6)

　　　　In the Ninth (and final) Cause of Action of Third Amended Complaint "A," plaintiffs

seek to hold individual defendants Sixt and Keane liable for aiding and abetting

discrimination in violation of New York Human Rights § 296(6), which provides that "it shall

be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce

the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec.

Law § 296(6).  However, the case law is clear that in order for an individual to be found

liable as an aider and abettor under this provision, liability must first be established as to

the employer.  *See, e.g., DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999)

(citing *Murphy v. ERA United Realty*, 674 N.Y.S.2d 415, 417 (App. Div. 2d Dep't 1998));

*see also Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp. 2d 520, 526

(S.D.N.Y. 2008) ("Before accessorial liability can be found as to an alleged aider and

abettor, the plaintiff must first establish liability as to the employer/principal."). Because this court has determined that there is no genuine issue of material fact for trial with respect to the City's liability under any of the claims alleged in the First through Eighth Causes of Action, plaintiffs cannot prevail on their state law "aider and abettor" claim against defendants Sixt and Keane.

Accordingly, the City defendants are entitled to summary judgment as a matter of law dismissing the Ninth Cause of Action of Third Amended Complaint "A."

## III.   Union Defendants' Motion

The Union defendants also move for summary judgment dismissing the retaliation claim alleged in Third Amended Complaint "A."

As discussed above, on March 13, 1998 (shortly after the filing of the original complaint against the City defendants), the Union filed a motion to intervene in this action as a party defendant in order to protect its rights as the Buffalo firefighters' sole and exclusive collective bargaining representative.  On that same day, Local 282 President Ronald Cassel wrote a letter to plaintiff Michael Brown, "personally and as president of M.O.C.H.A ....," advising that, since the Union is the exclusive bargaining agent and representative of Union members with respect to the issues addressed by this lawsuit, it considered the filing of this action prior to following bargained-for grievance procedures to be a violation of the CBA, as well as the Union Constitution and by-laws.  Item 10, Ex. B, p. 2.  The letter further advised that, "[i]f you persist in your lawsuit circumventing Local 282's grievance procedure, the executive board has been directed by the body to pursue union charges against the individuals/organizations involved."  *Id.*

In response, on May 22, 1998, plaintiffs filed an Amended Complaint alleging that the Union's conduct, as outlined in Mr. Cassell's March 13, 1998 letter, "is, upon information and belief, designed to intimidate members of MOCHA and African American Fire Fighters from pursuing legal remedies against the Defendants in connection with the matters herein alleged."  Item 10, ¶ 66.  The Third Amended Complaint contains an identical allegation.  *See* Item 247, ¶ 76.[5]

Title VII makes it unlawful for a labor organization "[t]o discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To make out a *prima facie* case of retaliation under this provision of the statute, the plaintiff must show that (1) he was engaged in an activity protected under Title VII and known to the union; (2) he suffered adverse union action; and (3) there was a causal connection between the protected activity and the union's actions.  *See Yerdon v. Henry*, 91 F.3d 370, 377 (2d Cir. 1996); *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991); *Agosto v. Correctional Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 309 (S.D.N.Y. 2000).  Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for its actions."  *Johnson*, 931 F.2d at 207 (internal quotation marks and citation

---

[5]Plaintiffs also alleged in the Amended Complaint that "Mr. Brown, individually and on behalf of MOCHA, filed a retaliation and racial discrimination charge against Local 282 which is still pending before the EEOC."  Item 10, ¶ 67.  The Third Amended Complaint, filed on July 26, 2006, contained an identical allegation.  *See* Item 247, ¶ 77.  However, the record reveals that the EEOC concluded its investigation of that charge in June 2000, finding it "more likely than not that the actions being taken [by the Union] are motivated by [Brown's] status and membership in a rival organization, which seeks to act as sole representative for some of [the Union]'s members, and not because of … race."  Item 473-4, pp. 38-39.

omitted).  Should the defendant meet this burden, the plaintiff must then show that the reasons given by the defendant were pretextual.  *See id*.

It is not a matter of serious dispute between the parties that plaintiffs were engaged in protected activity when they filed the complaint in this action, or that the Union knew about the lawsuit soon after it was filed.  Furthermore, the court will assume for present purposes that the Union's resolution to pursue charges against MOCHA and Brown for circumventing the CBA's grievance procedures, as advised in Mr. Cassell's March 13, 1998 letter, constituted "actionable" adverse action on the part of the Union "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 68 (2006) (internal quotation marks and citations omitted); *see also Johnson v. County of Nassau*, 480 F. Supp. 2d 581, 602 (E.D.N.Y. 2007).  And, the "very close" temporal proximity between the filing of the lawsuit and the adverse action can be considered "sufficient evidence of causality to establish a prima facie case" of retaliation. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

It is also clear from the record presented on summary judgment that the Union's assertion of its contractual rights as the exclusive representative of Union members with respect to the issues addressed by this lawsuit constitutes a legitimate nondiscriminatory reason for the action it took in advising Mr. Brown and MOCHA that the membership had passed a resolution authorizing charges for violating the CBA, the Union constitution, and Union by-laws by suing in federal court without resort to bargained-for grievance procedures.  Therefore, to survive the Union's motion for summary judgment, plaintiffs must come forward with sufficient evidence to support a rational jury's finding that this

reason was false, and that more likely than not race-based discrimination was the real reason that the Union's action.

As it found with respect to the claims against the City defendants, the court finds upon review of the record as a whole that plaintiffs have failed to come forward with any admissible evidence of race-based animus on the part of the Union, despite protracted discovery during the fourteen-plus years that this litigation has been pending. Rather, the record reveals that the Union actively pursued drug testing grievances on behalf of nine of the seventeen plaintiffs, and obtained favorable results in seven of those cases. *See* Item 473-9, pp. 6-8. The Union also successfully defended lawsuits brought by the City to bar arbitration of drug testing claims, and successfully arbitrated or favorably settled claims on behalf of certain of these plaintiffs. There is no evidence that the Union ever refused to process or pursue a grievance brought by an African American firefighter.

Based on these undisputed facts, and in the absence of any evidence upon which a reasonable inference of race-based discrimination could be drawn, the court finds that no rational juror could find in favor of plaintiffs on their claim that the Union defendants took action designed to intimidate plaintiffs from pursuing their legal remedies in connection with the matters alleged in this action, or otherwise discriminated or retaliated against them because of their race. Accordingly, the Union defendants are entitled to summary judgment as a matter of law dismissing the claims alleged against them in Third Amended Complaint "A."

## **CONCLUSION**

Based on the foregoing, the summary judgment motions filed by the City defendants (Item 467) and the Union defendants (Item 470) are granted, and the claims alleged in Third Amended Complaint "A" are dismissed.

Because this decision and order "is one that conclusively determines the pending claims of all the parties to the litigation, leaving nothing for the court to do but execute its decision…," *Citizens Accord, Inc. v. Town of Rochester, N.Y.*, 235 F.3d 126, 128 (2d Cir. 2000), it is to be considered in conjunction with the court's prior dismissal of the claims raised in Second Amended Complaint "B" as a "final decision" within the meaning of 28 U.S.C. § 1291.   The Clerk of the Court is therefore directed to enter final judgment pursuant to Fed. R. Civ. P. 54 in favor of all defendants, dismissing this action in its entirety.

So ordered.

_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

DATED:      _5/30___, 2012
Buffalo, New York